507 So.2d 332 (1987)
Brad DYE, Lieutenant Governor of the State of Mississippi and President of the Senate of the State of Mississippi
v.
The STATE of Mississippi, EX REL. Richard Stephen HALE and Gene Taylor, Members of the Senate of the State of Mississippi.
No. 57895.
Supreme Court of Mississippi.
April 29, 1987.
Rehearing Denied June 3, 1987.
*334 Edwin Lloyd Pittman, Atty. Gen. and Robert L. Gibbs, Asst. Atty. Gen., Jackson, for appellants.
Paul M. Neville, Jackson, for appellees.
Luther T. Munford, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for amicii curiae.
En Banc.
ROBERTSON, Justice, for the Court:

I. Overview

The powers of the Lieutenant Governor of the State of Mississippi are at issue this day. Historically considered enigmatic if not schizophrenic by the political scientist, a fifth wheel on the wagon of government and often a political graveyard in the parlance of the practical, the office of our Lieutenant Governor has in recent years grown greatly in influence and effect, so much so that two Senators have called upon the Judicial Department of the state to consider critically the extent, nature, source  and legality  of powers now being exercised by the present occupant of that office.
The Circuit Court held the Lieutenant Governor an officer of the Executive Department and as such, by our constitutional mandate that the powers of government be separate, precluded from the exercise of any powers properly belonging to the Senate, excepting only those powers expressly conferred upon him by the Constitution. We take a different view. The Senate has by constitutional authority broad powers to make rules regarding the conduct of its business. Constitutionally, the Lieutenant Governor is the President of the Senate. *335 As such he is one eligible to have conferred upon him such authority as the Senate by rule may from time to time provide. As explained more fully below, we reverse and render on the principal appeal.

II. Proceedings Below

On January 24, 1986, Senators Richard Stephen Hale[1] and Gene Taylor[2] filed their complaint in the Circuit Court of Hinds County, Mississippi, naming as defendant, Lieutenant Governor Brad Dye. In their complaint the Senators sought a declaratory judgment that Senate Rules 5, 6, 7, 17, 18, 19, 36, 37, 38, 48, 65, 74 and 75[3] violate Article I, Sections 1 and 2 (separation of powers provisions) of the Mississippi Constitution of 1890, and that, insofar as Lt. *336 Gov. Dye exercises powers under the purported authority of those rules, he proceeds in violation of the Constitution. Principal among the rules and power exercises challenged are those involving the Lieutenant Governor's almost plenary powers respecting appointment of committees and referral of bills to committees. The vice said to be found in these rules is that they constitute an unconstitutional delegation of legislative power to the Lieutenant Governor who is a member of the Executive Department of government. The Complaint finally sought entry of an order enjoining Lt. Gov. Dye from exercising the powers conferred on him by these rules.
Following Lt. Gov. Dye's answer, Senators Hale and Taylor filed a motion for judgment on the pleadings. Dye responded, opposing that motion and filing his motion for summary judgment. Thereafter, Senators Wendell Hobdy Bryan, William W. Canon, Walter A. Graham, Alan M. *337 Heflin, C.R. Montgomery and F.M. Smith, Jr. filed a motion for leave to file a brief and present argument as amicii curiae, which the Circuit Court granted.
On November 4, 1986, the Circuit Court entered a declaratory judgment holding that Lt. Gov. Dye was a member of the Executive Department of the government, that Senate Rules 7, 36, 37, 38, 48, 74 and 75 were unconstitutional, and that insofar as Lieutenant Governor Dye exercised powers provided in those rules he exercised legislative powers prohibited to him by Sections 1 and 2 of the Constitution. The attack upon Senate Rules 5, 6, 17, 18, 19 and 65 was rejected.
Lt. Gov. Dye timely perfected the present appeal, challenging so much of the declaratory judgment as invalidated Senate Rules 7, 36, 37, 38, 48, 74 and 75 and held unlawful his exercise of the powers conferred by those rules. Senators Hale and Taylor have cross-appealed and attack so much of the judgment below as left in force Senate Rules 5, 6, 17, 18, 19 and 65.
Senators Bryan, Canon, Graham, Heflin, Montgomery, and Smith have filed a brief as amicii curiae, supporting in substantial part the view of Lt. Gov. Dye and urging reversal.

III. Pre-Merits Issues

A. Subject Matter Jurisdiction

Lieutenant Governor Dye first objects to the Circuit Court's determination that it had subject matter jurisdiction of this action. The essence of the point, as we perceive it, is that the suit brought by Sens. Hale and Taylor, as Plaintiffs, was in the nature of a quo warranto action and that, because of certain alleged deficiencies in the Senators' efforts bring themselves within the strictures of that ancient writ, the complaint should have been dismissed. Blended with these apples are an orange and a grapefruit in the form of a challenge to the Senators' standing to sue and the claim that only the Attorney General could bring a suit such as this  the same Attorney General, we might add, who has elected to represent Lt. Gov. Dye and present to us this assorted pre-merits procedural fruit basket.
We begin with the proposition that the subject matter jurisdiction, a nonconfessable jurisdiction, turns upon the well pleaded allegations of the complaint. In Re City of Ridgeland, 494 So.2d 348, 350 (Miss. 1986); Brown v. Brown, 493 So.2d 961, 963 (Miss. 1986); American Fidelity Fire Insurance Co. v. Athens Stove Works, Inc., 481 So.2d 292, 296 (Miss. 1985). Our circuit courts are courts of general subject matter jurisdiction having authority to hear and adjudge all "matters civil" subject matter jurisdiction of which is not vested in some other court. Miss. Const. Art. 6, § 156 (1890); Miss. Code Ann. § 9-7-81 (1972); Hall v. Corbin, 478 So.2d 253, 255 (Miss. 1985). Considering the nature of the primary claim, we find no exclusive vesting in any other court of jurisdiction to hear and decide claims that an officer of one department of government is exercising power constitutionally vested in another department. Considering the nature of the relief sought, that the Lieutenant Governor's exercise of certain powers in the Senate be declared unconstitutional and that he hereafter "be debarred from exercising the ... [same]," we find the case akin to those historically within circuit court jurisdiction, to-wit: quo warranto proceedings. See Miss. Code Ann. § 11-39-3 (1972). Subject matter jurisdiction has not been altered by the procedural demise of the quo warranto writ.[4]See Rules 2, 81(c) and 82(a), *338 Miss.R.Civ.P. Without question, the allegations of the complaint were sufficient to confer upon the Circuit Court authority to proceed further. See Penrod Drilling Co. v. Bounds, 433 So.2d 916, 924-25 (Miss. 1983) (concurring opinion).
In their complaint Sens. Hale and Taylor allege that Lt. Gov. Dye is a member of the Executive Department of the government and that he is exercising legislative powers within the Senate, one house of the Legislative Department of government in violation of Miss. Const. Art. 1, §§ 1 and 2 (1890). Sens. Hale and Taylor thus state a claim upon which relief can be granted, see Stanton & Associates, Inc. v. Bryant Construction Company, Inc., 464 So.2d 499, 504-06 (Miss. 1985), much the same as was done in the converse setting of Alexander v. State, ex rel. Allain, 441 So.2d 1329 (Miss. 1983), wherein it was alleged that members of the Legislative Department of government were exercising powers at the core of and in the upper echelons of the Executive Department of government. It is a claim which, if proved and if not thwarted by defenses, would entitle Sens. Hale and Taylor to relief.

B. The Senators' Standing To Sue

The question of standing we resolve similarly against Lt. Gov. Dye, that also being a matter wherein we look only to the allegations of the complaint. Again, we are forbidden to assume any view of the correctness or ultimate merits of that complaint. Sens. Hale and Taylor allege that, by his exercise of powers in the legislative branch, Lt. Gov. Dye has deprived them of power and prerogatives lawfully theirs as Senators. The ongoing actions of Lt. Gov. Dye certainly have an adverse impact upon Sens. Hale and Taylor sufficient to confer upon them standing to sue. See Canton Farm Equipment, Inc. v. Richardson, 501 So.2d 1098, 1105-09 (Miss. 1987); see also Bowsher v. Synar, 478 U.S. ___, ___, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583, 593 (1986). We refuse to relegate to the Attorney General either the exclusive authority to bring a suit such as this or the discretion whether and how that authority should be exercised. Cf. Frazier v. State of Mississippi, 504 So.2d 675, 691-92 (Miss. 1987).

C. Justiciability

Lt. Gov. Dye also attacks the Circuit Court's jurisdiction on the grounds that this case involves a political question and therefore a non-justiciable controversy. Specifically, Dye argues that courts have no authority to examine rules of procedure passed by a legislative body for the governance of its own deliberations, since each body is supreme within the powers conferred by the Constitution, citing 16 Am.Jur.2d Constitutional Law §§ 312, 31 and Witherspoon v. State Ex Rel. West, 138 Miss. 310, 103 So. 134 (1925).
Sens. Hale and Taylor counter with the argument that their suit presents a claim of rights arising under the Mississippi Constitution of 1890 and as such can only be decided by the Judicial Department of this state's government. Alexander v. State Ex Rel. Allain, 441 So.2d 1329 (Miss. 1983). See also, Ex Parte Alabama Senate, 466 So.2d 914, 919-21 (Ala. 1985) (dissenting opinion).
Without doubt we will as a general rule decline adjudication of controversies arising within the Legislative Department of government where those controversies relate solely to the internal affairs of that department. Barnes v. Ladner, 241 Miss. 606, 616, 131 So.2d 458, 461 (1961). On the other hand, legislators nor the bodies in which they serve are above the law, and in those rare instances where a claim is presented that the actions of a legislative body contravene rights secured by the constitutions of the United States or of this state, it is the responsibility of the judiciary to act, notwithstanding that political considerations may motivate the assertion of the claims nor that our final judgment may *339 have practical political consequences. See Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 940-44, 103 S.Ct. 2764, 2778-80, 77 L.Ed.2d 317, 338-40 (1983); Powell v. McCormack, 395 U.S. 486, 516-22, 547-49, 89 S.Ct. 1944, 1977-78, 23 L.Ed.2d 491, 514-17, 531-33 (1969). Where, as here, it is alleged that one arguably a member of the Executive Department of government is exercising powers properly belonging to the Legislative Department, we are of necessity called upon to decide whether the encroachment exists in fact and, if so, whether it contravenes the mandate of Sections 1 and 2 of our Constitution that the powers of government be separate. See Alexander v. State Ex Rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983). We have authority to adjudicate the claims tendered this day.
Moreover, it is within our actual and judicial knowledge that the role, responsibility and authority of the office of the Lieutenant Governor have become matters of great public interest and no little controversy. There is a public need that the legal issues tendered be authoritatively resolved. Not only do we have the authority to decide today's questions; we have a public responsibility to do so. See Frazier et al. v. State of Mississippi, 504 So.2d 675, 692-93 (Miss. 1987).
And with regard to the claim that today's case involves a political question in which the judiciary should not become enmeshed, it is much too late to reclaim our virginity. That great constitutional and legal questions may become topics of political and even partisan controversy should never be employed by this Court as an excuse to duck its responsibility to adjudicate the legal and constitutional rights of the parties. Suffice it to say that this Court has for years entertained and decided on the merits controversies wherein parties claimed that members of one department of government were exercising powers in another in violation of the constitutional mandate for separation of powers. See, e.g., Alexander v. State Ex Rel. Allain, 441 So.2d 1329 (Miss. 1983); Clark v. State Ex Rel. Mississippi State Medical Association, 381 So.2d 1046 (Miss. 1980); Edward Hines Yellow Pine Trustees v. State Ex Rel. Moore, 133 Miss. 334, 97 So. 552 (1923); Broadus v. State Ex Rel. Cowan, 132 Miss. 828, 96 So. 745 (1923); Jackson County v. Neville, 131 Miss. 599, 95 So. 626 (1923).

D. Waiver and Estoppel/Exhaustion of Legislative Remedies

Lt. Gov. Dye next argues that Sens. Hale and Taylor have waived the claims they assert. This argument proceeds from the facts that they voted for the rules they now challenge. The argument is that the two Plaintiffs have been members of the Senate since the beginning of the 1984 legislative session, and, at the beginning of that session, the challenged Senate rules were adopted without a dissenting vote. Because there is no record that the Senators opposed the adoption of the challenged rules, Lt. Gov. Dye says they have waived the right to challenge the constitutionality of such rules and are estopped from doing so as well. Dye relies on two quo warranto cases decided by this Court in asserting that the defenses of waiver and estoppel are available in an action such as this. See State Ex. Rel. Jordan v. Mayor & Commissioners of Greenwood, 157 Miss. 836, 129 So. 682 (1930); State Ex Rel. Patterson v. Land, 231 Miss. 529, 95 So.2d 764 (1957). Additionally, Dye argues that the Senators failed to exhaust their nonjudicial remedies before filing this lawsuit. Specifically, Dye argues that the Senators should have utilized Senate Rules 29 and 30 which allow for a suspension of the Senate rules and an adoption of temporary rules.
Before considering these points, we must examine the facts. The Senate Journal of 1984 reflects that on the first day of the session, Senators Hale and Taylor were sworn in as members of the Mississippi State Senate. See Journal of the Senate of the State of Mississippi, p. 7 (1984). Immediately after the Senators were sworn in, Senate Resolution 1, consisting of proposed Senate Rules, was introduced. Included in these rules are those challenged in the instant case. The Journal reflects *340 that there was a vote on these rules and they were all adopted. See Senate Journal at p. 24. Specific votes of Senators were not recorded. All that is reflected upon examination of the Journal is that the rules were adopted. There is no indication whether there were any "Nay" votes, and, if so, by whom cast.
Little reflection is required to understand that Lt. Gov. Dye's argument must fail, for its acceptance would have the inescapable effect of establishing a new method of amending the Constitution  by waiver and estoppel. Alexander v. State Ex Rel. Allain, 441 So.2d 1329 (Miss. 1983) stands as authority for rejection of Dye's argument. The processes attacked in Alexander had been going on for decades with the implied and express consent of numerous Governors.[5] Under Dye's theory, we would have had to hold in Alexander that prior Governors' acquiescence had operated to constitutionalize the substantial legislative encroachments upon executive power. Similarly, we decline to require exhaustion of nonjudicial remedies in the case of a constitutional challenge such as that mounted here.

IV. Historical Background

A. Origins Of The Office Of Lieutenant Governor

The office of Lieutenant Governor exists by virtue of the provisions of Miss. Const. Art. 5, § 128 (1890). The general powers and duties of its occupant are prescribed by Art. 5, §§ 129-132 (1890).
Section 128 provides that "there shall be a lieutenant-governor." Central to today's controversy is Section 129 which provides
The lieutenant-governor shall, by virtue of his office, be president of the Senate. In committee of the whole he may debate all questions, and where there is an equal division in the Senate, or on a joint vote of both houses, he shall give the casting vote.
The office was originally created in the Mississippi Constitution of 1869. See G. Ethridge, Mississippi Constitutions, p. 248 (1928). In language identical to that found in the present Section 129, the 1869 Constitution made the Lieutenant Governor president of the Senate and conferred upon him the authority to debate all questions in the committee of the whole and to vote where necessary to break a tie. See Journal of the Proceedings in the Constitutional Convention of the State of Mississippi, 1868, p. 728 (1868) (Art. V, § 15, Miss. Const. 1869).
Pursuant to this constitutional mandate, the Mississippi Senate in 1870 adopted rules assigning certain duties to the Lieutenant Governor as presiding officer. Those duties included the appointment of committees. See Journal of the Senate of the State of Mississippi, p. 67 (1870) (Rule 30).

B. The 1890 Constitution

The 1890 convention opened with proposals by its President, S.S. Calhoon, including one to abolish the office of Lieutenant Governor.[6] He assigned the matter to the convention's Executive Committee. That Committee on September 25, 1890, reported its proposals for the executive branch to the convention. The committee proposed to retain the office of Lieutenant Governor as described in the 1869 Constitution. It proposed, however, to set the Lieutenant Governor's salary at $500 per year and no longer to permit that salary to be fixed by the Legislature.[7]
Delegates to the convention attacked this *341 compensation as a "luxury."[8] Delegate George C. Dillard offered a substitute to make the salary the same as that of the Speaker of the House. His remarks were reported as follows:
Mr. Dillard wanted the office continued, but he concurred in the objection very generally expressed, that the compensation as now fixed amounted to a luxury. No man should receive money from the public treasury unless he has an opportunity of rendering services.[9]
The convention adopted the substitute[10] and next considered a motion by delegate W.A. Boyd to strike all mention of the Lieutenant Governor. Delegates argued the people were against the office of Lieutenant Governor, it was an invention of the Convention of 1868, and it was a "fifth wheel to [the] wagon" of government.[11] On a vote of 45 to 37, the Boyd motion passed. The proposal, however, was held on a motion to reconsider.
On October 22, 1890, the convention reconsidered. In favoring reconsideration, Delegate J.B. Chrisman argued that it was
good policy to continue this office. The people ought to be allowed to vote for their Governor, and the President of the Senate who appoints the Committees of that body, ought to be entirely independent of local influences and responsible to the people alone. The conservative influence which such a position and responsibility brings to bear upon the mind and character of a presiding officer is of great benefit to the State, and will not be without its beneficient influence on the Senate. [emphasis added][12]
The motion to reconsider prevailed by an affirmative vote of 54 to 47 and what became § 129 of the Constitution of 1890 was adopted. See Journal of Proceedings 457.

C. Senate Rules of 1892 and 1912

The 1890 Constitution provides in Art. 4, § 55 that "[e]ach house may determine rules of its own proceedings... ." Pursuant to this section, the Senate first adopted rules in 1892. Those rules provided that the lieutenant governor would appoint all standing committees of the Senate and would serve on the Rules Committee. Senate J. 120, 125 (1892) (Rule 38).
These rules did not specifically address reference of bills to committees or control over Senate employees. A comprehensive 1912 revision of the Senate rules, however, placed both these matters within the jurisdiction of Lieutenant Governor as president of the Senate. See Senate J. 54 et seq. (1912) (Rules 6, 7, 8, 17, 18, 38). However, the Mississippi Senate's rules have historically interpreted the Lieutenant Governor's powers to include the selection of committees and the assignment of bills. Unlike State of Missouri ex rel. Danforth v. Cason, 507 S.W.2d 405, 413 (Mo. 1974), upon which the Senators rely for support, the legislative history shows that this was contemplated by the framers of the Mississippi Constitution.

D. The Office Today

Prior to the present Lieutenant Governor's assumption of duties in 1980, the office of Lieutenant Governor was not the source of power that it is today in the Senate. Dye's predecessors had discovered that the Lieutenant Governor's post was by no means an automatic stepping stone to higher office.[13] Indeed, when Dye assumed the duties of the office in 1980, and *342 proposed adoption of new Senate rules, the office of Lieutenant Governor took on a different flavor.[14] Illustrations of this newfound power abound since the new rules were adopted in 1980 and the present rules under attack in this appeal were adopted in 1984.[15] Moreover, the role of the Lieutenant Governor has been a hotly debated issue among members of the Constitution Study Commission appointed by Gov. Allain to formulate a proposal for a new state constitution.[16] Suffice it to say that from a position of power, the office of Lieutenant Governor today is far more attractive to would be public servants than once it was.
Although the Lieutenant Governor has attained greater powers in his role as President of the Senate, his authority in the Executive Department remains the same as it always has been. When the Governor is incapacitated or out of the state, the Lieutenant Governor "shall discharge the duties of said office until the Governor be able to resume his duties." (Art. 5, § 131) Otherwise, insofar as the Constitution is concerned, the Lieutenant Governor qua executive officer has nothing to do.

V. The Merits

A. Canons Of Construction

The briefs of the parties and amicii curiae are filled with admonitions regarding correct canons of constitutional interpretation, only two of which we find helpful.
First, constitutional provisions should be read so that each is given maximum effect and a meaning in harmony with that of each other. St. Louis & San Francisco Railway Co. v. Benton County, 132 Miss. 325, 330, 96 So. 689, 690 (1923); see also Tom v. Sutton, 533 F.2d 1101, 1105-6 (9th Cir.1976). To the extent that conflict may appear, specific provisions such as Sections 55 and 129 control over general provisions such as those of Sections 1 and 2. 16 Am.Jur.2d Constitutional Law § 103 n. 6 (1979).
Second, our Constitution is a document presumed capable of ordering human affairs decades beyond the time of its ratification under circumstances beyond the prescience of the draftsmen. Frazier v. State of Mississippi, 504 So.2d 675, 694 (Miss. 1987); Alexander v. State Ex Rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983). We should read and enforce the Constitution in the manner which best fits its language and best serves our state today. See Alexander v. State Ex Rel. Allain, 441 So.2d 1329, 1334, 1339 (Miss. 1983); Stepp v. State, 202 Miss. 725, 729-30, 735-36, 32 So.2d 447, 447-48, 33 So.2d 307, 309 (1948); Albritton v. City of Winona, 181 Miss. 75, 102-03, 178 So. 799, 806 (1938); Moore v. General Motors Acceptance Corp., 155 Miss. 818, 822-23, 125 So. 411, 412 (1930).

B. Mississippi's Separation Of Powers Doctrine

At its center this appeal presents the question whether the occupant of the office of Lieutenant Governor may consistent with the constitution control the makeup of Senate committees and the referral of bills to those committees. The Circuit Court held that the office of Lieutenant Governor was within the Executive Department of government and the powers at issue were powers properly belonging to the Legislative Department. Accordingly, the Circuit Court held that Lt. Gov. Dye was contravening the separation of powers barrier erected between executive and legislative.
*343 That barrier has been erected in Sections 1 and 2 of Article 1 of the Mississippi Constitution of 1890 which provide:
Section One. The powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.
Section Two. No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of these departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments. [Emphasis added]
Miss. Const. Article I, §§ 1 and 2 (1890).
In 1983 in the context of a plethora of legislative attempts to arrogate to that body powers properly belonging to the Executive Department of our government, we found great force and vigor in these provisions. Alexander v. State Ex Rel. Allain, 441 So.2d 1329 (Miss. 1983). We recognized that the 1890 Constitution had strengthened the mandate that the three great powers of government be separate.[17]Alexander, 441 So.2d at 1335. Of course, not every act is the exercise of a power. Not all "overlapping" is constitutionally proscribed, particularly regarding low level "administrative matters." Alexander, 441 So.2d at 1337. But where the acts are "ongoing and are in the upper level of governmental affairs" and have a substantial policy-making character, the "trespass reaches constitutional proportions." Alexander, 441 So.2d at 1337. The essence of Alexander is that no officer of one department may perform a function "at the core" of the power properly belonging to either of the other two departments. Alexander, 441 So.2d at 1345-46.
Alexander, however, does not decide today's question. The question whether the Lieutenant Governor could consistent with the constitution exercise the senatorial powers here challenged was not there presented, directly or by fair implication. To be sure, Alexander recognized that certain executive power had been vested in the Lieutenant Governor. Alexander, 441 So.2d at 1344. The converse proposition  the extent to which the Lieutenant Governor could in addition exercise powers in the Senate  was not addressed.
Alexander contains dicta to the effect that there are
no exceptions to the mandates that the powers of government be held and exercised in three separate and distinct departments and that no person holding office in any one department should have or exercise any power properly belonging to either of the others.
Alexander, 441 So.2d at 1335.
This language does not  and could not  alter the fact that Sections 129-132 inescapably provide an exception to the separation mandate by vesting in the Lieutenant Governor some authority in the Executive Department and other authority in the Legislative Department, thus making him an officer of both departments. Nor does it or anything else in Alexander answer the question whether under Section 55 the Senate *344 might confer upon its president power properly belonging to the Senate.

C. Are The Powers Inherent In The Office Of President Of The
 
Senate?
Lt. Gov. Dye argues that Section 129 makes the Lieutenant Governor, by virtue of his office, President of the Senate and that certain powers inhere in the office among which are the powers controverted this day. Put otherwise, we are asked to define the office "President of the Senate" as including these authorities. We decline to do so.
No doubt the individual who occupies the office of President of the Senate has the authority to do something more than merely engage in debate in the committee of the whole and cast tie breaking votes, but no issue tendered requires an identification of that "something more" and nothing said here should be taken as indicating any view on the point. It is sufficient for today that the power to control the assignment of Senators to standing, select and conference committees as well as the power to control referral of bills to committees are not among the powers inherent in the office of President of the Senate.
We reach this conclusion not unaware of Lt. Gov. Dye's reference to a learned treatise published in the mid-1800s which states, "[T]he duties of the presiding officer of a legislative assembly ... are ... [T]o receive and submit in the proper manner all motions and propositions present by the members...." L. Cushing, Elements of Law and Practice of Legislative Assemblies in the United States of America 112-13 (1856). Referring bills to committees and appointing senators to committees is a presiding officer power conferred by the Senate upon its President, the Lieutenant Governor as the President of the Senate.
Cushing also states, "[I]n the legislatures of the United States, the presiding officer of the lower, or popular branch is called the speaker; and, in some of them, the same appellation is given to the presiding officer of the other branch; but, in the greater number, the title of the latter is the president." Cushing at 110-11. This is true in the Mississippi Legislature.
To like effect is the commentary of the late Justice of this Court, George H. Ethridge in his 1928 treatise, Mississippi Constitutions:
This is a very important office, even though the lieutenant governor may never be called upon to act as governor, as he is president of the Senate, and usually has the power to appoint the committees of the Senate; and by virtue of such power can largely direct the action of the Senate, because legislation is very largely controlled by committees who have charge of the bills and to whom they must be referred under another section of the Constitution. The lieutenant governor usually refers the bills, when they are introduced, to such committee as he may desire. It is true the Senate may refer them by vote, or may afterwards control the committee by a majority, but such is rarely done. [Emphasis added]
G. Ethridge, Mississippi Constitutions, p. 249 (1928).
We have no doubt of the correctness then and now of the statement of fact that the duties of the presiding officer of a legislative assembly often include the appointment of committees and the receipt and submission of motions and bills,[18] but *345 this begs the question, which regards the authority under which these duties are given.
But, if the powers at issue are not inherent in the office of President of the Senate, what is their nature and their source? The rules conferring these powers, it will be recalled, fall into two general categories. Senate Rules 7, 36, 37, 38 and 48 empower the Lieutenant Governor to control the membership of all standing, select and conference committees, including the chairman and vice-chairman thereof. Rules 74 and 75 empower the Lieutenant Governor to control the referral of bills to committees. The Circuit Court found that the combined effect of these rules goes "straight to the heart of the legislative process," a conclusion which is obviously correct.
Lt. Gov. Dye, however, in brief and at oral argument has insisted that these rules do not authorize him to exercise legislative powers. We are told that legislative powers include the introduction of bills, debate thereon and ultimately the casting of votes for or against same, and nothing else. Yet as any freshman political science student knows, the power to appoint committees and control referral of bills to and among the various committees are powers of great practical effect in the Senate.
The point is that nothing turns on whether the powers at issue are legislative powers, generic variety. We are concerned with whether these are powers vested in or inherent in the Senate. In this regard we perceive, without a shadow of a doubt, these are "power[s] properly belonging to" the Senate within the meaning and contemplation of Miss. Const. Art. 1, § 2 (1890). As such, the more important inquiry becomes whether the Lieutenant Governor may exercise those powers consistent with the Constitution.

D. The Senate's Rule Making Power

The powers at issue being among those properly belonging to the Senate, it follows on principle that the Senate possesses inherent authority to direct the manner of their exercise. That inherent authority is augmented by Article 4, § 55, of the Mississippi Constitution which provides, "[E]ach house may determine rules of its own proceedings... ." Miss. Const. Art. 4, § 55.
In Witherspoon v. State Ex. Rel. West, 138 Miss. 310, 324-25, 103 So. 134, 138 (1925), this Court wrote:
[t]he words in which the grant of power to the Senate to adopt rules of procedure is couched are about as broad and comprehensive as the English language contains, and this Court is without the right to ingraft any limitation thereon.
The legislature is a co-ordinate department of the government, and each house thereof is supreme in its own sphere, and no other department of the government has the right to interfere therewith.
The Court concluded by saying the Senate's interpretation of its rule making power "should not be departed from, unless manifestly wrong." 138 Miss. at 326, 103 So. at 138-39.
While this Court certainly has the authority to declare Senate rules unconstitutional, the Court should not do so unless those rules are "manifestly" beyond the Senate's constitutional authority. Indeed, this Court has zealously defended its authority to make rules regulating procedures within the Judicial Department free of any restrictions found in statutes. Newell v. State, 308 So.2d 71, 76 (Miss. 1975); Order Adopting the Mississippi Rules of Civil Procedure, May 26, 1981; Order Adopting Mississippi Rules of Evidence, September 24, 1985. Considerations of *346 comity militate in favor of this Court's restraint in the face of a challenge to the Senate's similar prerogative to adopt its own rules, absent manifest unconstitutionality of a type not present here.[19]
The Senate has adopted Senate Rules 7, 36, 37, 38, 48, 74 and 75 as its own rules of proceedings. The assignment of senators to committees is merely a procedural mechanism to break the mass body of the Senate into small groups that can more effectively deal with the review, amendment if necessary, and reporting of Senate bills to the entire Senate. Likewise, the manner of reference of bills to committees is procedural. Bills are referred to committees for study and for modification if necessary. The Senate as a whole could not effectively achieve this task. The reference of bills merely allows the Senate to function more efficiently. The Senate Rules at issue are rules of procedure within the meaning and contemplation of Article 4, § 55, of the Constitution. They are rules respecting the details of the exercise of those legislative powers that inhere in the Senate.

E. Is The Lieutenant Governor An Eligible Receiver?

But, notwithstanding these conclusions, is the individual who occupies the office of Lieutenant Governor one eligible to have conferred upon him or her the powers enumerated in Senate Rules 7, 36, 37, 38, 48, 74 and 75? The Circuit Court held that the Lieutenant Governor is a member of the Executive Department and that, by virtue of the separation of powers doctrine, he is ineligible to receive the powers so delegated nor to exercise them if delegated.[20] The point loses force when we recognize that there is no natural law of separation of powers. Rather, the powers of government are separate only insofar as the Constitution makes them separate. The Lieutenant Governor is unusual in that he is made an officer of  and given powers in  two branches of government.[21]See Miss. Const. Art. 5 §§ 128, et seq.
We begin with the premise that surely the Senate may confer these powers upon one or more of its members. By virtue of Section 129 of the Constitution, the Lieutenant Governor is made President of the Senate and given certain powers not *347 relevant here. By virtue of his being President of the Senate, the Lieutenant Governor is enough of a member of the Senate that he is eligible to have conferred upon him the legislative powers granted by the rules here at issue. The Lieutenant Governor does not possess these powers by reason of any authority inherent in the office of President of the Senate. His office merely serves to place him in the Senate, on the Senate side of the separation of powers barrier. As such Lt. Gov. Dye enjoys the powers at issue by virtue of the Senate's action taken in accordance with its inherent delegatory authority. The manner of his exercise of these powers is for the moment regulated by the Senate's rule-making action taken under the authority of Section 55 of the Constitution. The Senate could amend or rescind those rules to modify or withdraw the powers at issue at any time it wished, consistent with the Constitution.[22]
The combined effects of subparts C, D and E above provide our Constitution  and particularly Sections 1, 2, 55 and 129 thereof  a reading that gives maximum effect to each relevant provision and assigns each a meaning in harmony with that emanating in the others. It is consistent with the legitimate political needs of our state in 1987. All of this leads to the conclusion that there is great merit in Lt. Gov. Dye's Assignment of Error No. 2. The Circuit Court erred when it held that Senate Rules 7, 36, 37, 38, 48, 74 and 75, individually or collectively, violate the separation of powers mandate of Article 1, §§ 1 and 2, of the Mississippi Constitution of 1890.

VII. Cross-Appeal

If the Senate has constitutional authority to confer upon the Lieutenant Governor the powers enumerated in rules 7, 36, 37, 38, 48, 74 and 75, it follows without the necessity of further exposition that the Senate might also confer upon him the far less significant powers found in Rules 5, 6, 17, 18, 19 and 65. The cross-appeal of Sens. Hale and Taylor is denied.

VIII. Final Judgment

By reason of and consistent with the foregoing, a declaratory judgment should be entered in favor of Lt. Gov. Dye and against Sens. Hale and Taylor respecting Dye's exercise of the powers conferred upon him by Senate Rules 5, 6, 7, 17, 18, 19, 36, 37, 38, 48, 65, 74 and 75.
Sens. Hale and Taylor on December 12, 1986, filed a motion in part seeking payment of their legal expenses. By order of January 14, 1987, that motion has been carried with the case. The motion is now denied.
Lt. Gov. Dye's motion in the nature of a motion to stay or, in the alternative, petition for writ of supersedeas is denied as moot.
ON DIRECT APPEAL, REVERSED AND RENDERED; ON CROSS-APPEAL, AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J. and DAN M. LEE, PRATHER, ANDERSON and GRIFFIN, JJ., concur.
*348 SULLIVAN, J., concurs in part and dissents in part by separate written opinion, joined by HAWKINS, P.J.
HAWKINS, P.J., dissents by separate written opinion, joined by SULLIVAN, J.
SULLIVAN, Justice, concurring in part and dissenting in part:
We live in interesting times. While the House chamber echoed with the cry, "the King is dead," the Senate chamber declared, "Long live the new King." While the House was reasserting democratic government in a belief that its members were capable of organizing themselves into a representative legislative body, the Senate, through its rules, was abandoning all pretext of self-organizing ability and creating a monarch to organize and rule over them. If these movements are to be seen as ploys in the ongoing game of one-upsmanship between these two legislative chambers, then the Senate clearly won by creating a power figure to rival anything ever seen in the House. If, however, these movements are to be seen as a reflection of the democratic ideal of direct representation of the people within the legislature, then the House clearly took the superior approach. More than that, the House acted within constitutional parameters, while the Senate action was outside those limitations.
In reversing the circuit court, this Court has approved not only the Senate action, but it has approved the creation of a new form of government, not envisioned by the constitution nor countenanced by our people. We have allowed the Senate to diminish itself and debase the dignity and authority of each of its members. In the past, we stoutly refused to allow the legislature to encroach upon the executive branch of government, yet today we have apparently approved the right of the legislature to invite the executive branch of government to encroach upon them. It seems to me that if our constitution forbids the one, it also forbids the other.
Nevertheless, our decision today allows the Senate to create from the largely ceremonial office of Lieutenant Governor a powerful legislative creature, a super-senator, vested with sufficient legislative authority to virtually dominate the entire Senate.
In doing this, I believe we have deserted the constitutional mandate of separation of powers in Mississippi government and we have heavily tipped the scales of the once-balanced power structure away from the Senators and toward the office of Lieutenant Governor From this day forward Mississippians must give far greater care to their selection of their Lieutenant Governor than they give to their choice of any other elected official, for now the Lieutenant Governor is not only a heartbeat from the Governor's chair, he also controls one-half of Mississippi's legislative branch of government. All men must tread softly in the presence of such power. Mississippians would also be well advised to determine from their candidates for the office of State Senator, if those candidates would serve the electorate or the Lieutenant Governor. Today's decision implies that a Senator may be unable to function effectively unless he chooses to serve the latter.
The belief in government of and by the people also received a body blow by our decision today. In my view, by today's decision we have arrogated unto ourselves the power to drastically amend our constitution without so much as a "by your leave" to the people of Mississippi, the sole source of constitutional power under our form of government. That we have chosen to exercise such unwarranted authority upon so slender a thread as the reasoning in the majority opinion is beyond my comprehension.
In the face of today's decision which is predicated upon an untenable reading of the Constitution of 1890, I am compelled to dissent from this Court's approval of the transfer of seemingly limitless and unconstitutional powers to the office of the Lieutenant Governor. I understand the issue for resolution today to require a determination of to what extent, if any, the Mississippi Senate may abdicate its legislative powers, duties and responsibilities to the Lieutenant Governor and to what extent the *349 Lieutenant Governor may accept and exercise these legislative powers.
Our analysis must be guided by the plain language of the Constitution of 1890, the basic compact of government for the State of Mississippi and the yardstick by which all Mississippi law must be measured.
In assessing the constitutionality of the various senate rules in issue today, we are bound by certain rules of construction, the importance of which led me to briefly detail them below.

I.

CANONS OF CONSTITUTIONAL CONSTRUCTION
We are bound in our study of this issue by certain guidelines and in my opinion we are required to apply the rules that follow:
Provisions of the constitution must be read so that each is given its maximum effect and a meaning in harmony with the other constitutional provisions. St. Louis & San Francisco Railway Co. v. Benton County, 132 Miss. 325, 330, 96 So. 689, 690 (1923). To the extent that conflict may appear specific provisions control over general provisions. 16 Am.Jur.2d, Constitutional Law, Section 103 n. 6 (1979).
The constitution is a document presumed capable of ordering human affairs beyond the time of its ratification under circumstances beyond the precincts of the draftsmen. Frazier v. State of Mississippi, 504 So.2d 675 (Miss. 1987). Therefore, we should read and enforce it in the manner which best fits its language and best serves our state today. Alexander, ex rel. v. Allain, 441 So.2d 1329, 1334, 1339 (Miss. 1983). To be sure, if the language of the constitution is plain the Court must enforce it. State, ex rel Greaves v. Henry, 87 Miss. 125, 40 So. 152, 154 (1906). Moreover, where the constitution deals with the subject the words of the constitution must be the sole boundary. State ex rel. Greaves, 40 So. at 154. In other words, where the language of the constitution is plain, subsequent action by the departments of government are contemporaneous or antecedent history on the subject cannot be appealed to for interpretation. The real intent must be taken from the language of the constitution itself. State ex rel Greaves, 40 So. at 154 (Emphasis added).
Where the constitution schedules powers, giving or taking away, it must be presumed to have scheduled all, and we must look only to the constitution with its necessary implications for the limit of the power granted or the restriction imposed. State ex rel. Greaves, 40 So. at 154.
When these rules are followed and applied to the language of our constitution what emerges is a clear picture of a comprehensive, cohesive, and harmonious blueprint for a functional state government divided into three departments which are to be operated in an orderly manner to serve the best interest of the people of Mississippi.
Only when each provision of the constitution is given its maximum effect and a meaning in harmony with the other provisions is this possible.
If the constitutional provisions in question here are harmonious in nature when given equal effect one with the other no conflict exists between them and this Court need not, in fact may not resort to enforcing the specific provisions of the constitution at the cost of the general provisions.
The language found in Article 1, Sections 1 and 2 declaring the constitutional law of separation of powers is plain and we must enforce it.
The unambiguous language of Article V, Sections 128 through 132 concerning the office of Lieutenant Governor is plain and we must enforce it. This language also is in harmony with the unambiguous language in Article I, Sections 1 and 2.
The unambiguous language contained in Article IV, Sections 33, 35, 37, 38, 39, 55, and 99 is also plain and must be enforced by this Court. These sections of Article IV can and must be read in harmony with Article V and Article I. Read together there is produced a harmonic symphony of orderly government. Read as though the provisions conflict what results is a cacophony of discord and chaos.
*350 When, in Article V, Section 131, the constitution scheduled executive powers of the Lieutenant Governor, it scheduled his entire executive power and we must look only to that constitutional provision for the limit of his executive authority.
When Article V, Section 129, scheduled the legislative powers of the Lieutenant Governor, it scheduled all of the legislative powers the office of Lieutenant Governor may exercise. We must look only to that language for the limitation of his executive authority.
As the language of Article V, Section 129, is plain the subsequent action by the senate and the Lieutenant Governor may not be appealed to by this Court. Nor may this Court for the same reason appeal to contemporaneous or antecedent history on the subject of the Lieutenant Governor's legislative power and the authority of the senate to confer legislative power upon him beyond that prescribed by the constitution.

II.

THE HISTORICAL BACKGROUND
As the language of the Constitution of 1890 is plain and as our Canons of Construction do not allow us to use antecedent of the subject for interpretive purposes, I offer this background merely to illustrate the stealthy, persistent and malignant erosion of the legislative power and the concurrent aggrandizement of the power of the Lieutenant Governor in the face of an expressed constitutional limitation upon the legislative authority of the office.

A.

THE 1869 CONSTITUTION
The office of Lieutenant Governor was recreated by the Constitution of 1869, a document which also made the Lieutenant Governor the ex officio president of the Senate, allowed him to debate all questions in the committee of the whole, and authorized him to vote where necessary to break a tie. Article V, Section 15, Mississippi Constitution 1869 (1868).
Rule 30 of the Senate Rules adopted in 1870 allowed the Lieutenant Governor to appoint Senate committees. No constitutional challenge was made in the courts of this State to this cession of legislative power by the Senate to the Lieutenant Governor. But it is plain that these rules represent nothing more than the subsequent action of a part of the legislative department and a part of the executive department to which this Court may not appeal for interpretation in the face of the plain language of the Constitution of 1869.

B.

THE 1890 CONSTITUTION
The Executive Committee of the constitutional convention of 1890 proposed to retain the Lieutenant Governor's office as it had been in the Constitution of 1869 but to set the salary so that it might no longer be controlled by the legislature. Toward that end, a substitute motion was adopted by the convention making the Lieutenant Governor's salary the same as that of the speaker of the house. The real battle in this convention was not over the Lieutenant Governor's exercise of both the executive and legislative powers nor over his salary; it was over the very existence of the office of Lieutenant Governor itself.
Delegate W.A. Boyd moved that the convention strike all mention of the Lieutenant Governor from the 1890 Constitution and his motion passed by a vote of 45 to 37. Boyd's motion was held on a motion to reconsider and when he spoke in favor of reconsideration Delegate J.B. Chrisman said:
Now, I call the attention of the convention to the slender majority by which the white counties of the state hold that body [the Senate]. It is only by a majority of three. Who can foresee the future and guarantee white supremacy when it depends on such a contingency as I have indicated.
But aside from the considerations I have suggested, I think it good policy to continue this office. The people ought to be allowed to vote for their governor, and the president of the senate who appoints *351 the committees of that body, ought to be entirely independent of local influences and responsible to the people alone. The conservative influence which such a position and responsibility brings to bear upon the mind and character of a presiding officer is of great benefit to the state, and will not be without its beneficient influence on the senate.
When read in its full context, the Chrisman speech is less persuasive as a sound declaration of constitutional policy and more evident as an open appeal to the maintenance of white supremacy and ancient themes of fear, injustice and inequality. For whatever reason the speech brought about its desired effect and seventeen delegates who had not voted on the Boyd motion cast their lot with Chrisman, and the Lieutenant Governor's office was saved. The final vote was 54 to reconsider and a resolute 45 to abolish the office. The effort to return to a strong legislative president of the senate with ex officio executive branch duties was roundly defeated. Today, the majority seeks to restore this strong legislative power to an executive officer, by a judicial fiat. Such an act is not constitutionally permissible.
I concede that by selective reading it is certainly possible to glean from this speech support for the idea that the President of the Senate [the Lieutenant Governor] has constitutional power to appoint Senate committees. However, I hasten to point out that the language being given such an interpretation is found merely in the speech of a delegate on the convention floor. This language did not survive to be placed in the Constitution of 1890. Therefore we may not say that this speech may be construed to find the intention of the plain constitutional language. We must look only to the language itself and when we do so this power to appoint is noticeably absent.

C.

SENATE RULES
I repeat that under proper Canons of Constitutional Construction when the constitutional language is plain the subsequent actions of the governmental departments may not be utilized to define the constitutional intent. Were this not so this Court would have approved the legislative encroachments upon the executive authority done with the acquiescence of the executive department when we decided Alexander v. State, ex rel. Allain, 441 So.2d 1329 (Miss. 1983). We rejected such a view then and we must reject it now. To do otherwise is to stamp with our approval the old saw that as between friends the constitution is nothing.
I review the history of the Senate Rules for the sole purpose of exhibiting how they have quietly and slowly undermined the constitution and ultimately serve to whittle away the power and dignity of the Senate. Gradually through Senate Rules the office of Lieutenant Governor has been transformed from that of a "Governor in Waiting" into that of an "Overlord of the Senate." The delicate balance of the scales of state government, so meticulously provided for by the constitutional doctrine of separation of powers, has been altered beyond recognition. It is a metamorphosis of monstrous proportions that has gone unchallenged until this day. In 1892 the Senate adopted rules of its own proceedings under Article IV, Section 55 allowing the Lieutenant Governor to appoint standing committees and to serve upon the powerful rules committee. Notably, these rules did not provide the Lieutenant Governor with the power to refer bills to the various committees. It is significant that in 1892 no challenge was made to the constitutionality of these rules.
In 1912 the Senate revised their rules of proceedings and not only gave the Lieutenant Governor the right to appoint committees and committee chairmen, the Senate placed the Lieutenant Governor on the rules committee and gave him the power to refer bills to committees. Again, there was no challenge to the constitutionality of the adoption of these rules.
In 1980 the then Lieutenant Governor-elect drew up new Senate rules which greatly expanded the power of the office of Lieutenant Governor while at the same *352 time shrinking the power of the senate. These Lieutenant Governor rules were not made public nor did the Lieutenant Governor-elect name any committee chairmen until after the Senate had adopted his rules. While this may be in keeping with the letter of the law contained in Section 55, that each house may determine rules of its own proceedings, on its face it appears that the Lieutenant Governor drew up the Senate rules and the senate merely acquiesced in them. The letter of the law? Perhaps. The spirit of Section 55? Definitely not. Once again however, there was no challenge made to the constitutionality of the Lieutenant Governor's rules which were adopted by the Senate in 1980.
It was not until the adoption of the present Senate rules that two Senators challenged the constitutional right of the Lieutenant Governor to dominate and control the legislative process of the Senate through the use of the Senate's internal rules of procedures.
Alarmed by the apparent aggrandizement of the power of the Lieutenant Governor and the concurrent reduction of their power as Senators, which potentially greatly reduced their effective ability to represent the people who elected them, these two Senators filed this action.

III.

QUESTIONS TO BE ANSWERED
May the Senate delegate legislative authority to the Lieutenant Governor beyond that specifically granted to that office by the Constitution of 1890?
May the Lieutenant Governor exercise legislative authority beyond that expressly granted to his office by the Constitution of 1890?
What is the nature of the office of President of the Senate?
What is the nature of the office of Lieutenant Governor?
What is the role of Article I, Sections 1 and 2, Mississippi Constitution of 1890?

IV.

SEPARATION OF POWERS
Article I is entitled Distribution of Powers and under it Section 1 reads as follows:
Section 1. The powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.
This section provides that the powers of state government shall be divided into three distinct departments; the executive, legislative, and judicial departments. Any office or position fashioned under the Constitution of 1890 must be fixed under only one of these departments, unless, the constitution by its own terms creates an office that fits in more than one of the departments of government. To me it is indisputable that the Lieutenant Governor is a part of the executive department by virtue of Article V, Section 128, but it is equally clear that under Article V, Section 129, the Lieutenant Governor is made ex officio President of the Senate and given express and very limited legislative power. Thus the constitution has made an exception to its general rule of separation of powers, but it has also definitively delineated the boundaries within which it will tolerate an invasion of that separation.
Section 2 of Article I provides:
Section 2. No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once vacate any and all offices held by the person so accepting in either of the other departments.
The first sentence of Section 2 strongly states the prohibition against violating the constitutional doctrine of separation of powers. The last sentence provides a penalty in no uncertain terms for those who violate the separation of powers provision. There can be no mistaking the meaning and *353 intent of the second sentence of Section 2. The significance of this sentence is that the drafters of three previous constitutions had expressly declared the powers to be separate, but had not included the penalty sentence.[1]
The severity of the penalty imposed by Section 2 makes unmistakable the importance placed upon keeping the three departments of government separate by the drafters of the 1890 Constitution. A trespass upon the departmental separations is to be treated summarily. The violater not only forfeits his office in his original department of government but he forfeits any and all public offices at the instant he crosses into the forbidden zone.
The founders of this nation recognized in the federal system the absolute necessity for the separation of powers of the different departments of government. In his farewell address George Washington warned, "The spirit of encroachment tends to consolidate the powers of all of the departments in one, thus to create, whatever the form of government, a real despotism."[2] John Adams said, "It is by balancing each of these three powers against the other two, that the efforts and human nature toward tyranny can alone be checked and restrained, and any degree of freedom preserved in the Constitution.[3] James Madison, considered the father of the Constitution, emphasized, "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."[4] Such was the importance placed upon the political doctrine of separation of powers by the founders of this country. The Mississippi Constitution of 1890 evinces the same concern, but carries it one significant step further.
Unlike its federal counterpart, the state concept of Separation of Powers was made a rule of constitutional law in Mississippi and is not merely a political doctrine. Article I of the State Constitution states the primary and overriding ethic of government imposed upon us by the Constitution of 1890. The Draconian nature of the penalty for violating this prime governmental ethic leaves no doubt that the separation of powers is a constitutional commandment of foremost importance. It is not merely a political suggestion to be ignored as convenience dictates.
This Court has already stated this obvious precept of Mississippi Constitutional Law when speaking through Chief Justice Patterson in Alexander v. State, ex rel Allain, 441 So.2d 1329, 1335 (Miss. 1983):
We must conclude the intention of the draftsmen was that there be no exceptions to the mandates that the powers of government be held and exercised in three separate and distinct departments and that no person holding office in any one department should have or exercise any power properly belonging to either of the others.
I cannot agree with the majority when it characterizes these powerful words as dicta. This significant language lies at the vital center of the Alexander decision and illuminates with pristine clarity the central concept of the homogeneous Constitution of Mississippi. There can be no exception to the separation of power mandates and no person holding office in one department shall exercise any power properly belonging to either of the other departments of government.
Chief Justice Patterson has both clarified and simplified the question before us today. Do these senate rules transfer powers properly belonging to the legislative department to the Lieutenant Governor, a *354 member of the executive department? In his exercise of the powers bestowed upon him by these rules does the Lieutenant Governor exercise powers which properly belong to the legislative department?
To answer these questions we must turn our attention to the historical office of Lieutenant Governor to see what constitutional powers properly belong there.

V.

THE PRESIDENT OF THE SENATE
The Constitution of 1817 provided for the executive department in Article IV.
Section 18 of Article IV created the office of Lieutenant Governor and Article IV, Section 19, made the Lieutenant Governor, by virtue of his office, President of the Senate. The only legislative authority granted to the Lieutenant Governor as President of the Senate was the right to debate when in the committee of the whole and to vote on all questions and when the Senate was equally divided to give the casting vote. He was given no authority to give the casting vote on an equal division of a joint session of the legislature. No mention is made in the Constitution of 1817 of any right of the Lieutenant Governor to appoint committees, serve upon committees, assign bills, or to control the employees of the Senate.
In 1832 Mississippi adopted a new constitution which did not provide for the office of Lieutenant Governor. Exclusive executive power was vested in the governor. The only other offices of the executive department mentioned in Article V were the Secretary of State, County Sheriff, County Coroner, County Treasurer, County Surveyor, County Ranger, State Treasurer and an Auditor of Public Accounts.
Article III created the legislative department within the Constitution of 1832. Article III, Section 4 vested the legislative power of the State into two distinct branches, the Senate and the House of Representatives.
Article III, Section 15 provided that the House of Representatives shall choose a speaker and its officers and the Senate shall choose a president and its officers. The Speaker of the House of Representatives was to be a member of that body and the President of the Senate was to be a Senator.
Section 16 allowed each house to determine rules of its own proceedings.
Article V, Section 17, provided that when the office of the governor shall be vacant by death, resignation, removal from office, or otherwise, the President of the Senate shall exercise the office of governor until another governor shall be duly qualified.
The constitutional scheme created by the 1832 document clearly made the President of the Senate a constitutional office solidly implanted in the legislative branch of the government. The ex officio duty of the President of the Senate was to serve as Governor in the event that office became vacant. Manifestly, under the Constitution of 1832, the President of the Senate had the authority to exercise the legislative power to appoint committee chairmen, appoint committees, serve on committees and vote and debate on all issues. The President of the Senate was in fact a member of the Senate. He was not a member of the executive branch of the government. Thus he could freely and constitutionally exercise all of the legislative powers claimed today by the Lieutenant Governor, who is not a member of the Senate.
In the Constitution of 1869 the office of President of the Senate vanishes from the legislative department and the office of Lieutenant Governor re-emerges to be found in the executive department under Article V. Article V, Section 14 recreates the office of Lieutenant Governor and Section 15 provides that by virtue of his office as Lieutenant Governor he shall be President of the Senate. His legislative duties were limited to debating in committee of the whole and voting when there was an equal division in the Senate or on a joint vote of both houses. This represents the change from the original Lieutenant Governor's office created in 1817. There the Lieutenant Governor as President of the Senate could debate and vote on all issues *355 but could not vote on a joint vote of both houses. Here the Lieutenant Governor as President of the Senate could only vote in the event of a tie.
Article V, Section 17 of the Constitution of 1869, set out the primary duty of the Lieutenant Governor, i.e. to serve as governor if that office became vacant by death or otherwise. In 1817 Mississippi began with an executive officer known as the Lieutenant Governor whose primary duty was to fill the office of governor when it became vacant and whose ex officio duty was to preside over the Senate with expressly limited legislative power. This system changed in 1832 with the creation of the legislative office of President of the Senate who was a member of the Senate vested with full legislative powers and who by virtue of that office had the ex officio duty of filling the office of governor when for any reason it became vacant. In 1869 Mississippi reverted to its original governmental plan and provided for a Lieutenant Governor with limited legislative powers exercised in an ex officio role.
As has been seen the delegates to the Constitution of 1890 expressly rejected the attempt to return the office of President of the Senate to its status in 1832, and instead maintained the executive office of Lieutenant Governor with limited legislative duties obtained only by the status of ex officio President of the Senate.

VI.

THE LIEUTENANT GOVERNOR
As we have seen this office was reborn in 1869 in the executive department of state government and was retained there by a small majority in the Constitution of 1890.
It is not, given our constitutional history, insignificant that the Lieutenant Governor's office was established under the executive department in 1890. A reading of Article V, Sections 128 through 132, makes it apparent that the Lieutenant Governor under the present constitution is closely associated with the office of governor. The two are elected at the same time, for the same term, in the same manner, and must have the same qualifications.[5]
If the Lieutenant Governor's election is contested, the contest is tried and decided in the same manner as is a contest for the office of governor.[6]
The primary function of the Lieutenant Governor under the 1890 Constitution is set out in Article V, Section 131.
Section 131. When the office of governor shall become vacant, by death or otherwise, the lieutenant governor shall possess the powers and discharge the duties of said office. When the governor shall be absent for the state, or unable, from protracted illness, to perform the duties of the office, the lieutenant governor shall discharge the duties of said office until the governor be able to resume his duties; ...
When there was no constitutional office of Lieutenant Governor, this duty was the secondary function, ex officio, of the Senator who was elected by the Senate to serve as President of the Senate.
The secondary function of the Lieutenant Governor under the Constitution of 1890 is set forth in Article V, Section 129.
Section 129. The lieutenant governor shall, by virtue of his office, be president of the senate. In committee of the whole he may debate all questions, and where there is an equal division in the senate, or on a joint vote of both houses, he shall give the casting vote.
The Lieutenant Governor is President of the Senate in an ex officio capacity and his function is primarily ornamental. The only legislative power scheduled for the Lieutenant Governor as President of the Senate *356 is the constitutional right to debate all questions in committee of the whole and break the tie votes that may occur in the Senate or in joint sessions of both houses. The Lieutenant Governor has no other legislative power. He may vote on no other occasion, either on the Senate floor or in the committee rooms.
As contrasted with the 1832 Constitution, Section 129 primarily serves to keep the Lieutenant Governor in the State Capitol during legislative sessions in the event that he is needed to serve as governor, and to avoid the possibility of tie votes. Unlike the President of the Senate of 1832, the Lieutenant Governor is otherwise unnecessary to the legislative process and has no other legislative powers.
The debate in the Convention of 1890 that surrounded the retention of the office of Lieutenant Governor makes it obvious that the delegates were aware that under the Constitution of 1832 the Senator who was the President of the Senate had the legislative power to appoint committees, name committee chairmen, refer bills to committees, and actually serve on the committees. Those delegates who sought to retain that form of power in the President of the Senate also sought to abolish the office of Lieutenant Governor. In this effort they were unsuccessful. The proponents of the office of Lieutenant Governor were equally aware that that office was primarily an executive office with the aforementioned very limited legislative powers. Had they intended to vest in the Lieutenant Governor as ex officio President of the Senate the right to appoint committees, name chairmen, refer bills to committees, and actually serve on committees, they had available the necessary votes to schedule those legislative powers in Section 129 so that there would be no question that the Lieutenant Governor as President of the Senate was essentially a legislative officer. They did not do so.
We must conclude from this that there was no intention in the Constitution of 1890 that the Lieutenant Governor would exercise the enormous legislative powers that the Constitution of 1832 had vested in the President of the Senate. Nothing in the Constitution of 1890 permits the Lieutenant Governor to amass unto himself enormous legislative powers that allow him to cast a long shadow across the halls of government. To the contrary, the office of Lieutenant Governor is clearly reduced to that of a part of a shadow cast by the governor himself. This was done by deliberate design.
In Moore v. Grillis, 205 Miss. 865, 39 So.2d 505 (1949), this Court held that the constitution does not grant specific legislative powers but limits them. If that be true then the legislative powers granted to the Lieutenant Governor are specifically limited to those set forth in Section 129. Any attempt by the Senate to enlarge upon that specific grant of power is unconstitutional.
If the Supreme Court allows the Senate to give the Lieutenant Governor legislative power in excess of the power expressly granted to that office by the constitution what is to prevent some future Senate taking from the office of Lieutenant Governor those powers expressly granted by the constitution. The majority opinion opens the door for the Senate to tell the Lieutenant Governor that he may not vote to break a tie vote in the Senate. All that would be required to bring this about would be the adoption of a Senate rule under the guise of the Senate's authority to make rules for its proceedings.

VII.

THE LEGISLATIVE DEPARTMENT
Article IV creates and defines the powers, duties and responsibilities of the legislative department of Mississippi Government. Sections 33, 35, 37, 38, 39, 55, and 99 are pertinent to the issues involved in this case.
Section 33 vests the total legislative power of this State in the legislature which consists of a Senate and a House of Representatives.
Section 35 provides that the Senate shall consist of members chosen every four years by the qualified electors of the several *357 districts. This section sets forth who may be a member of the Senate. Section 99 makes it clear that the legislature shall not elect any other than its own officers with some exception. The Senate does not elect the Lieutenant Governor as President of the Senate and it follows that he then is not a legislative officer except as set forth by Section 129.
Section 38 also allows the Senate to elect its own officers and the Lieutenant Governor is not in that number.
Section 39 allows the Senate to choose from its own members a President Pro Tempore to act in the absence or disability of the Lieutenant Governor.
Section 37 provides for the manner by which one may become a member of the Senate.
The rules of procedure for the legislature are set forth in Article IV, Section 55, which in its entirety reads as follows:
Each house may determine rules of its own proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds of the members present, expel a member; but no member, unless expelled for theft, bribery, or corruption, shall be expelled the second time for the same offense. Both houses shall, from time to time, publish journals of their proceedings, except such parts as may, in their opinion, require secrecy; and the yeas and nays, on any question, shall be entered on the journal, at the request of one-tenth of the members present; and the yeas and nays shall be entered on the journals of the final passage of every bill.
The majority seizes upon nine words from this entire section "Each house may determine rules of its own proceedings, ..." and would have us believe that by virtue of these nine words the Senate may invest the Lieutenant Governor with some vague sort of status as a senator and then grant unto him full legislative powers that only legitimately existed in the President of the Senate when he was a constitutional officer under the Constitution of 1832. I find nothing in the Constitution of 1890 that allows the Senate of Mississippi to create a Senator out of the whole cloth.
Of equal importance is the majority's concept that once the Senate has made the Lieutenant Governor enough of a Senator, that the Senate may then, free of constitutional prohibitions, significantly expand the legislative power that may be exercised by the Lieutenant Governor.
As early as 1860 the High Court of Errors and Appeals of the State of Mississippi operating under the Constitution of 1832 held that the legislative power of this State was vested exclusively in the Senate and the House of Representatives and that the legislature could not surrender any portion of that authority or authorize its exercise by any other body or person without violating the constitution. Alcorn v. Hamer, 38 Miss. 652, 749 (1860). It is apparent to me that as the people of Mississippi delegated all legislative powers exclusively to the legislature of which the Senate is a part, the Senate may not in turn delegate those legislative powers to the Lieutenant Governor without the consent of the people. The language of the Constitution of 1890 does not provide the Senate with the consent of the people for this re-delegation of legislative authority.
As I view it the efforts of the Senate from 1890 until 1984 to vest the Lieutenant Governor with legislative power is based upon the false premise that the Lieutenant Governor serves as President of the Senate in the same manner as the President of the Senate under the Constitution of 1832. This simply is incorrect. What we are presented with is an effort on the part of the Lieutenant Governor and the Senate of the State of Mississippi to retain the office of Lieutenant Governor as provided for in the Constitution of 1890 and to engraft upon it fullsome legislative powers of the President of the Senate contained in the Constitution of 1832. I find such a "cut and paste" concept of constitutional interpretation to be totally unacceptable.

VIII.

THE MAJORITY'S CONSTITUTION
In my view the Constitution of 1890 does not permit the conclusion reached by the *358 majority and therefore that result is unreachable.
Only by finding a constitution that does not exist in Mississippi may the majority justify the position that it takes.
One way this wishful conclusion may be accomplished is to return to the Constitution of 1832. Of course, that document did not allow for the office of Lieutenant Governor although it did provide for a President of the Senate elected from the Senate itself and fully vested with all legislative powers.
That President of the Senate was ex officio, the Governor when the Governor could not serve.
It appears to me that the majority attempts to restore the Constitution of 1832, as the majority denigrates the Lieutenant Governor's primary duty to step in as governor when the occasion demands it and exalts the Lieutenant Governor's legislative role as his primary function.
The majority not only seeks to retain the office of Lieutenant Governor from the 1890 Convention it seeks to add to that office the unlimited legislative power of the 1832 Constitution's President of the Senate. This the Convention of 1890 emphatically refused to do and it is far too late for this Court to reverse that decision.
The majority might also justify its opinion if it could amend the Constitution of 1890 along the following lines.
Article V, Section 129.
The lieutenant governor shall also be the president of the senate, and as such a member of the senate vested with full legislative powers. He may, as president of the senate, exercise any legislative power that may be exercised by any other senator elected to that body.
Unfortunately such a constitutional provision does not exist and this Court is without the authority to write it into the present constitution.

IX.

CONCLUSION
For the reasons already stated, I would affirm the judgment of the Circuit Court of Hinds County upon the direct appeal and reverse and render it upon the cross-appeal and enter judgment here for Senators Hale and Taylor.
I would declare that Senate Rules 5, 6, 7, 17, 18, 19, 36, 37, 38, 48, 65, 74, and 75 are expressly unconstitutional and violate Article I, Sections 1 and 2 of the Constitution of 1890. I would hold that the Lieutenant Governor may not exercise the legislative powers attempted to be conferred upon him through these rules by the Senate and I would expressly enjoin him from exercising those legislative powers.
As the trial court did not address itself to the penalty provision of Article I, Section 2, I would not propose that this Court do so.
I would deny the motion of Lieutenant Governor Dye to stay or in the alternative, to grant a writ of supersedeas as it is moot.
I would find the motion of Senators Hale and Taylor seeking payment in part of their legal expenses to be well taken and I would remand it to the trial court for determination.
In my view the judgment that should be rendered is as follows:
ON DIRECT APPEAL, AFFIRMED; ON CROSS-APPEAL REVERSED AND RENDERED.
HAWKINS, P.J., joins in this opinion.
HAWKINS, Presiding Justice, dissenting:
I join Justice Sullivan's dissent, and also express my gratitude to him for changing what I am now convinced were erroneous views.
There is but one question in this case. Is the lieutenant-governor exercising legislative powers in violation of our Constitution?
If all that was involved in this case was our state Senate's undoubted authority under Section 55 of our Constitution to make whatever rules it pleases to govern its proceedings, respect for and deference to that body would create an insurmountable barrier to any judicial umbrage on my part. I *359 profoundly consider it none of the judicial branch's business how the Senate chooses to operate its affairs.
Slowly, and painfully I might add, I have inescapably become convinced, however, that far more is at stake here than the Senate simply adopting its own rules.
The question is whether the Senate by its rules has corrupted the second highest Executive office of our State by giving it legislative power prohibited by our Constitution. Such corruption occurs in two ways, first by bestowing powers upon it not given by our Constitution or any statute, and second by making the Chief Executive Office of this state, the Office of Governor, a secondary insofar as the duties owing by the lieutenant-governor to the Executive branch of government. Rather than the lieutenant-governor being a check on the Senate, as our Constitution intended in making him the presiding officer of the Senate, we have his office, by virtue of the license of enormous powers gratuitously bestowed upon it by the Senate, a check upon the Chief Executive Officer of our State. Thus, we have the tail wagging the dog. And, in case of a dispute between the two branches, there is no question but that the lieutenant-governor would know which side of his bread has the butter. The power given him by the Senate is far greater than the power given his office by our Constitution.[1]
Of course, the ultimate duty of every official of this state is to serve the people, by abiding by and upholding our laws and our Constitution.
It is also the duty of an officer of any branch of government to see that his branch is not encroached upon or weakened by another branch. A failure to uphold his own branch is a failure to uphold the Constitution which made each branch separate and co-equal.
Has the Senate by its rules put the lieutenant-governor in a position of having two masters, the Executive Branch and the Legislative Branch?

LAW
Article I. Sections 1 and 2 provide:
ARTICLE I
DISTRIBUTION OF POWERS
Section 1. The powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: Those which are legislative to one, those which are judicial to another, and those which are executive to another.
Section 2. No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the persons so accepting in either of the other departments.
Article I, Section 1 provides for the separation of powers into three distinct departments, Section 2 emphatically prohibits any person in one department exercising "any power properly belonging to either of the others."
The lieutenant-governor is a member of the Executive department of our state government. Our Constitution sets forth the duties and qualifications of his office immediately following those of the governor.
Article V. Executive, Section 129 states:
The lieutenant-governor shall, by virtue of his office, be president of the senate. In committee of the whole he may debate all questions, and where there is an equal division in the senate, or on a joint vote *360 of both houses, he shall give the casting vote.[2]
In this case the lieutenant-governor is just as clearly exercising awesome powers in the very heart of the legislative process, most notable of which is the appointment of all committees in the Senate. He has this legislative authority solely because the Senate has granted him this power.
Thus, surely no one will question that the lieutenant-governor is a member of the Executive department,[3] and just as clearly exercising power properly belonging to one of the legislative branches of our state government.
In the absence of a grant of such authority elsewhere in the Constitution, a more blatant violation of Sections 1 and 2 of our Constitution can hardly be envisioned.
Where, then, is the authority for any possible claim the lieutenant-governor has the Constitutional authority to assume such powers? Section 129 and Article IV, Section 55 are the sole repository for any such notion.
Section 129 simply tells us that the lieutenant-governor by virtue of his office is president of the senate (which is nothing more than a presiding officer, see: Article I, Section III, clause 5 of the U.S. Constitution, making the vice-president "President of the Senate"), and further that he may join in debate, and in case of tie vote may cast a vote.
The first and only relevant clause of Section 55 states: "Each house may determine rules of its own proceedings."
There is nothing about either of the sections giving the lieutenant-governor the authority to exercise the plenary legislative powers the Senate by its rules has bestowed upon him.
Indeed, as noted, Sections 1, 2 and 129 and Article IV, Section 55 may be read in perfect harmony with no disquietitude by the lieutenant-governor simply fulfilling the duties expressly granted him by Section 129 and stopping there.
No plain reading of our Constitution suggests the lieutenant-governor has the authority to exercise the awesome additional powers bestowed upon him by the Senate. It simply does not exist.
It would have been quite simple for the drafters of our Constitution, had they so intended, to authorize the lieutenant-governor to assume such legislative powers as the Senate bestowed upon him. If they meant him to have such powers, why was it not spelled out? Why leave to conjecture by future courts this egregious trespass of Sections 1 and 2?
The majority opinion edifies us for 24 pages before it decides to address the core question, which it proceeds to discuss with extraordinary brevity. The majority concludes there is no violation by the lieutenant-governor.
[B]y virtue of his being President of the Senate, the Lieutenant-Governor is enough of a member of the Senate that he is eligible to have conferred upon him the legislative powers granted by the rules here at issue. [Emphasis added]
Majority Opinion, p. 346.
Why is the lieutenant-governor "eligible"? The majority does not enlighten us why this is true. This ipse dixit pronouncement is followed soon by another:

*361 [H]is office merely serves to place him in the Senate, on the Senate side of the separation of powers barrier. As such Lt. Gov. Dye enjoys the powers at issue by virtue of the senate's action taken in accordance with its inherent delegatory authority.
Id. at 347.
Why does the Senate have the "inherent delegatory authority" to authorize the lieutenant-governor to violate Sections 1 and 2? Except for the majority ex cathedra pronouncement, none.[4]
Finally, with a lilt the majority recites that interpreting our Constitution as it does provides Sections 1, 2, 55 and 129 with a "reading that gives maximum effect to such relevant provision and assigns each a meaning in harmony with that emanating in the others."
No doubt about the majority giving a "maximum effect" interpretation to Sections 129 and 55  a "ballooning effect" is more precise  but is not giving any "maximum effect" interpretation to Sections 1 and 2. And, the "harmony" the majority finds in its interpretation escapes my musical ear. Again, the majority fails to give us any reason to support its statement.
There is no authority to support such statements. There is no need for any exercise in esoteric reasoning in reading these sections. The Constitution makes it plain what authority the lieutenant-governor has and stops. It defies reason to suggest Section 129 and Section 55 state more than what they plainly provide.[5]
Any further power bestowed upon his office is an aggrandizement beyond its lawful authority.
Let me talk a little bit about power. In Trial of Thomas Paine, 22 How.St.Tr. 443 (1792), Thomas Erskine is reported with saying:
Arbitrary power has seldom or never been introduced into any country at once. It must be introduced by slow degrees, and as it were step by step lest the people should see its approach. The barriers and fences of the people's liberty must be plucked up one by one, and some plausible presences must be found for removing or hoodwinking, one after another, those sentries who are posted by *362 the constitution of a free country, for warning the people of their danger.
Justice Sutherland, in Jones v. Securities & Exch. Comm., 298 U.S. 1, 24, 80 L.Ed. 1015, 1025, 56 S.Ct. 654 (1936), makes the following observation:
Arbitrary power and the rule of the Constitution cannot both exist. They are antagonistic and incompatible forces; and one or the other must of necessity perish whenever they are brought into conflict.
Arbitrary power, I might add, is any power not clearly authorized by law.
Recently, in Frazier, et al. v. Attorney General, 504 So.2d 675 (Miss. 1987), we stated: "It is not the function of the Courts to dwarf the grandeur of the Constitution by decisions which stifle any of its promises."
If indeed the Senate deems the lieutenant-governor should be authorized by the Constitution to exercise the powers it has bestowed upon his office, the Legislature is free to submit an amendment to the Constitution to the people. Let them speak. All sides can openly debate the matter, and this would settle it. This Court has no business making such amendment by judicial interpretation.[6]
What the Senate has done de facto, the majority of this Court now makes the law of this State, that the lieutenant-governor is in the Legislative branch of government and can exercise legislative powers. What will this Court decide when the statutes giving the lieutenant-governor executive powers to appoint members to executive boards and sit on executive boards are challenged? Will this Court then put him back into the Executive branch and say he is an executive officer as well? Does this office now have the Constitutional authority to assume and exercise whatever legislative and executive powers the Legislative sees fit to give it? Do Sections 1 and 2 have no meaning at all, insofar as the office of lieutenant-governor is concerned?
The majority has thrown us into a sea of uncertainty, doubt and confusion, all of which could have been easily avoided by our following the simple wording of 129 and holding that his authority ceases with the power specifically given him by that section. What Gordian knots of own creation await us?
In my respectful view, the authors of our Constitution had more intelligence than ever to have intended to make the lieutenant-governor's office a hermaphrodite in state government.
Courts are passive instruments of public policy. We can only act when impelled by litigants. When act we must, however, our decisions can be far reaching. Thus, in this case, we have the singular, if not unique, opportunity to correct a corrosive anomaly.[7]
We are at the crossroad of an issue of some importance in state government. By interpreting the Constitution as it plainly reads, our state government "may move forward into broad, sunlit uplands." If we fail, we remain in the abyss, made more foreboding no doubt by the stamp of approval the highest court in this state places upon unauthorized power.
SULLIVAN, J., joins this opinion.
NOTES
[1] Senator Hale represents senatorial district 51, which lies within Jackson County, Mississippi.
[2] Senator Taylor represents senatorial district 46 which is made up of parts of Hancock, Harrison and Jackson Counties.
[3] The Rules of the Senate of the State of Mississippi which are challenged here are in their full text as follows:

5. The President of the Senate shall have full and exclusive authority over the Secretary, officials and employees of the Senate. He may make such rules and regulations for the government of such officials and employees as he may think fit and proper. In case of violation of any orders of the President of the Senate by an employee, or officer, or in case of any misconduct, inefficiency or omission of any such employee, or officer, the President shall have the authority to hear such complaints and to discharge any employee or officer. In case of violation of any orders of the President of the Senate by the Secretary or the Sergeant-at-Arms, or in case of any misconduct, inefficiency, or omission by the Secretary or Sergeant-at-Arms, the President shall refer such complaint to the Committee on Rules which shall have the authority to hear such complaints and discharge the Secretary or the Sergeant-at-Arms.
6. The President shall assign the news, radio and television reporters, wishing to take down or broadcast the debates and proceedings of the Senate, places in the Senate so as not to interfere with the convenience of the Senate. But any representative of any newspaper, radio or television station, who shall purposely misrepresent or misreport any of the proceedings of the Senate may during the remainder of the Session, be denied admission to such privileges, if by majority vote of Senators present and voting, the Senate so orders.
7. The President shall nominate standing committees as provided in Rule 36. He shall also appoint all select and conference committees as ordered by the Senate from time to time.
17. The Secretary, with the approval of the President, shall provide for the appointment of pages, whose salaries shall be fixed by the Committee on Contingent Expense. Not more than six pages shall serve throughout the session as senior pages, and one of these six shall be designated as head page by the Secretary. Nominations of pages by members of the Senate shall be submitted to the Secretary as soon as possible so that they may be properly scheduled. The said pages shall be not less than twelve years of age.
18. The Secretary, with the approval of the President, shall appoint sufficient personnel to carry on properly and efficiently the business of the Senate. Salaries thereof shall be fixed by the Committee on Contingent Expense.
19. There shall be an Assistant Secretary, and an additional Assistant Secretary when needed, appointed by the President for a term of four years, unless removed as provided in Rule 5. The duties of the Assistant Secretary shall be comparable to those of the Secretary.
36. The following standing committees, except the Committee on Rules, shall be appointed by the President, who shall also fill vacancies occurring thereon:

Agriculture .......................................... 13 members
Appropriations ....................................... 21 members
Business and Financial Institutions .................. 13 members
Conservation ......................................... 15 members
Constitution .......................................... 9 members
Contingent Expense .................................... 5 members
 (The Chairman of the Senate Contingent Expense Committee
 shall be the Lieutenant Governor, the Vice Chairman shall be
 the President Pro Tempore, three members shall be appointed by
 the Lieutenant Governor).
Corrections .......................................... 11 members
County Affairs ........................................ 9 members
Education ............................................ 15 members
Elections ............................................. 9 members
Fees, Salaries & Admin. .............................. 13 members
Finance .............................................. 21 members
Forestry .............................................. 9 members
Highways & Transportation ............................ 19 members
Insurance ............................................ 13 members
Interstate & Federal Cooperation ...................... 5 members
Judiciary ............................................ 21 members
Labor ................................................. 9 members
Local and Private ..................................... 5 members
Military Affairs ...................................... 7 members
Municipalities ....................................... 11 members
Oil, Gas & Other Minerals ............................ 11 members
Ports and Industries .................................. 9 members
Public Health & Welfare .............................. 19 members
Public Property ....................................... 7 members
Public Utilities ..................................... 11 members
Rules
 (The Committee on Rules shall consist of the Lieutenant
 Governor, the President Pro Tempore of the Senate, and five
 Senators, one from each Congressional District of the State,
 having served in the Senate at least four years, to be selected
 by the Senators from their respective congressional districts
 by caucus).
Universities and Colleges ............................ 13 members
 JOINT COMMITTEES
Executive Contingent Fund ............................ (5 Senators
 5 Representatives)
Investigate State Offices ............................ (9 Senators
 9 Representatives)
State Library ........................................ (5 Senators
 5 Representatives)
Enrolled Bills ....................................... (5 Senators
 5 Representatives)

37. Standing, select and conference committees shall be appointed by the President.
38. The first member named on a committee shall be its Chairman and the second member named shall be its Vice-Chairman, unless it is specifically provided that they shall be elected. There shall be no further rank on the committees, the remaining members being listed thereon in alphabetical order. In the event of a vacancy in the chairmanship or vice chairmanship, or membership, the vacancies shall be filled by appointment by the President.
48. A conference committee on the part of the Senate shall consist of three Senators, unless otherwise ordered by a majority vote of the Senate, and they shall be appointed by the President.
65. The Committee on Rules shall consist of the Lieutenant Governor, the President Pro Tempore, and five Senators each having served at least four years in the Senate, one from each congressional district of the State, to be selected by the Senators from their respective congressional districts by caucus. The resident county of the Senator representing such district shall determine the congressional district caucus in which he shall participate and for which he may hold membership on the Rules Committee.
74. Senators who desire to introduce bills and concurrent resolutions and Senate resolutions, may place same in the box at the Secretary's desk at any time, or they may send them to the Secretary's desk by pages when the order for introduction is reached.
In addition to any other time provided by law or by rule, members of the Senate may file bills or resolutions with the Secretary of the Senate at any time during the period between sessions of the Legislature. Such prefiled bills shall be numbered by the Secretary of the Senate and referred by the Lieutenant Governor to the appropriate standing committee of the Senate for study. Such prefiled bills shall be introduced in the order filed on the first day of the next succeeding regular session of the Legislature, or special session if included within the Governor's call, and referred to committee in the regular order of business of the Senate.
No bills may be prefiled in any year of a general election until after a member of the Senate has been finally elected in the November general election.
75. Upon introduction of Senate bills, the Secretary shall read the titles thereof and then give the bills to the President for his study and reference to proper committees. The President may retain such bills in his possession until the opening of the next succeeding legislative day's session when he shall return such bills to the Secretary with the committee references noted thereon. Whereupon, the Secretary shall give such bills serial numbers, and, at the proper time in the Order of Business, the Secretary shall read the numbers, titles and committee references, and have said titles reproduced for distribution. House bills received with messages from the House shall be treated likewise regarding references to committees and reading of titles by the Secretary. Provided, however, that the President may, at his option, refer Senate bills immediately upon their introduction and House bills immediately upon their receipt from the House. Provided, further, that a motion is in order for the immediate consideration in Committee of the Whole of any bill or resolution, except bills of Local and Private nature, before such bill or resolution is referred to a standing committee.
[4] Lt. Gov. Dye's nostalgia for the ancient writ of quo warranto to the contrary notwithstanding, we live in a new age. The forms of action are dead, nor do they rule us from their graves, as Rule 2, Miss.R.Civ.P., declares boldly that

There shall be one form of action to be known as "civil action."
Hall v. Corbin, 478 So.2d 253, 256 (Miss. 1985). From the Official Comment, we learn that Rule 2 "may be the most fundamental rule of all," one of its consequences being that "forms of action are abolished." The quo warranto writ under Miss. Code Ann. § 11-39-1, et seq., being a form of action, was thus interred effective January 1, 1982. See also Rule 81(c), Miss.R. Civ.P. Although there is really no doubt of the matter, we find this in Appendix B to the Mississippi Rules of Civil Procedure, to-wit:
The form of relief formerly obtainable under a writ of quo warranto, or writ in the nature of quo warranto, shall hereafter be obtained by motions or actions specifically seeking relief; to the extent that Title 11, Chapter 39 of the Mississippi Code of 1972 prescribes rules of practice and procedure pertaining to quo warranto, such statutory rules are supplanted by the applicable provision of the M.R.C.P.
[5] The legislation challenged in Alexander was approved by the Governor, or, at least, was not vetoed, for otherwise it could never have become law.
[6] This account is based on the Journal of the Proceedings of the Constitutional Convention of the State of Mississippi (1890) ("Journal of Proceedings") and detailed daily reports of debates published in the Daily Clarion-Ledger. At its conclusion the Convention commended the newspapers for their coverage. See Journal of Proceedings 580. This Court considers these debates pursuant to Rules 201 and 803(16), Miss.R.Ev. Judge Calhoon's proposal is at Journal of Proceedings 33.
[7] Journal of Proceedings 153; Miss. Const. Art. 5, § 16 (1869).
[8] Daily Clarion-Ledger, Sept. 27, 1890, at 1, col. 4.
[9] Id.
[10] Journal of Proceedings 290.
[11] Daily Clarion-Ledger, Sept. 27, 1890, at 1, col. 4.
[12] Daily Clarion-Ledger, Oct. 22, 1890, at 1, col. 2.
[13] That the office of Lieutenant Governor provided no automatic stepping stone for higher office is illustrated by the races of the six immediate predecessors to Dye who ran for Governor. Of these six, only two were successful in gubernatorial races. And, of the two successful candidates, only one was elected Governor immediately following his term as Lieutenant Governor. Indeed, had the most recently elected of the two lacked a tenacious spirit, he likely would have encountered little success. See Mississippi Official & Statistical Register pp. 105-06 (1984-88).
[14] See The Clarion-Ledger Jackson Daily News, Dec. 16, 1979, at 1F; The Clarion-Ledger, Jan. 4, 1980, at 3A; The Clarion-Ledger, Jan. 9, 1980, at 3A; The Clarion-Ledger Jackson Daily News, Jan. 20, 1980 at 1I; The Clarion-Ledger, Sept. 10, 1983 at 6A; The Clarion-Ledger Jackson Daily News, April 15, 1984, at 1F.
[15] See The Clarion-Ledger, Jan. 4, 1980, at 3A; The Clarion-Ledger, Jan. 20, 1980, at 1I; The Clarion-Ledger, Jan. 22, 1980 at 2B; The Clarion Ledger, Feb. 8, 1985 at 1B; Jackson Daily News, April 16, 1985, at 3C; The Clarion-Ledger, Jan. 6, 1987, at 1B.
[16] See Jackson Daily News, Feb. 25, 1986, at 1C; The Clarion-Ledger, Feb. 25, 1986, at 1A; Jackson Daily News, June 26, 1986, at 1A; The Clarion Ledger, June 26, 1986, at 1A; The Clarion Ledger, July 9, 1986, at 1B; Jackson Daily News, Dec. 18, 1986, at 1B; The Clarion Ledger, Dec. 19, 1986, at 20A; Jackson Daily News, Dec. 22, 1986, at 16A.
[17] At the 1890 convention the "distribution of powers" sections were lumped together with "boundaries" and assigned to the Legislative Committee on October 4, 1890. Journal of Proceedings 334. The committee reported on Oct. 8, 1890. The distribution of powers sections were approved on October 20, 1890, without amendment or debate. Journal of Proceedings 365, 444; Daily Clarion-Ledger, October 20, 1890, at 1, col. 2.

As approved on the convention floor, the prohibition in Section 2, like its 1869 predecessor, ended with an additional phrase "except in the instances in this Constitution expressly directed or permitted." Journal of Proceedings 442. Section 2 was sent to the Committee on Revision, which omitted this phrase in its final draft. Journal of Proceedings 581. The rules governing the Committee on Revision prohibited changes in the "intent or meaning of any matter." Journal of Proceedings 351-52. Logically, the revisors may have omitted this phrase because it is well understood that specific language, such as Section 129, controls over general language such as Section 2, and the phrase "properly belonging" sanctions exercises of power "otherwise directed or permitted" by the Constitution.
[18] At the risk of confusing the familiar with the necessary, we note that the duties granted to the Mississippi Lieutenant Governor are far from unique. According to Gona, The Lieutenant Governor: The Office and Its Powers 14 (Council of State Governments 1983):

Twenty-eight lieutenant governors are presiding officers of the senate, with varying degrees of responsibility for activities within that chamber  activities such as appointing standing or special committees, breaking ties on roll call and organizational votes, assigning bills, and taking care of other administrative or housekeeping functions... . (footnotes omitted)
The generally accepted reasons for the Lieutenant Governor's legislative role include the need to have a permanent and impartial presiding officer over the Senate. As stated in Isom, The Office of Lieutenant-Governor in the States, 32 Am.Pol.Sci.Rev. 921, 922 (1938):
There are three main reasons why the office is found in so many of the states: first, the people want elective officials; second, the office provides for a permanent and impartial presiding officer for the senate without robbing any district of its senator; and third, precedent has favored the office, since from the very beginning it has existed in most of the larger and more influential states. (footnotes omitted)
See also Morris, Virginia's Lieutenant Governors: The Office & the Person, 30 (University of Virginia 1970).
[19] While courts in other jurisdictions have discussed the powers of a lieutenant governor, see, e.g., Rouse v. Johnson, 234 Ky. 473, 28 S.W.2d 745 (1930), Annot. 70 A.L.R. 1095, none has addressed the precise question present here. Plaintiffs here rely upon a case in which the Missouri Senate was held to have lawfully taken certain powers away from its lieutenant governor. In State of Missouri Ex. Rel. Danforth v. Cason, 507 S.W.2d 405, 417-19 (Mo. 1974), the court held that a Missouri constitutional provision making the lieutenant governor "ex officio President of the Senate" did not bar the Senate from adopting rules which gave the power to refer bills to the President Pro Tempore instead of the lieutenant governor. The Missouri court relied on the Missouri Senate's authority under its constitution to adopt its own rules. Here the situation is precisely the reverse of that found in Cason.
[20] To be sure, the office of Lieutenant Governor is created and defined in a series of constitutional sections found in Article 5 of the Constitution. Article 5 is labeled "Executive," and this we are told places the Lieutenant Governor exclusively within the Executive Department of government. We think the import of the constitution's article labels more modest. They are a mere facility of convenience, adding or detracting nothing from the content of the substantive language of the various sections of the constitution. Indeed, the article labels carry no more significance than do the section numbers.

For example, the offices of Attorney General (Art. 6, § 173) and District Attorney (Art. 6, § 174) are found in the article labeled "Judiciary," yet these offices are commonly thought of as belonging to the Executive Department of government. Moreover, qualifications for membership on a county board of supervisors are provided in the "Judiciary" article (Art. 6, § 176), but this does not exclude supervisors from the exercise of legislative, executive or administrative functions. Beyond this we find liberally sprinkled through Article 4, labeled "Legislative Department" duties and powers respecting executive and judicial officers.
[21] The office of Governor is also vested with powers arguably legislative in a generic sense. He may call the legislature into extraordinary session (Art. 5, § 121), recommend legislation (Art. 5, § 122), approve legislation (Art. 4, §§ 72, 73) or veto the same (Art. 4, §§ 72, 73). No one suggests that the Governor violates separation of powers when he approves a piece of legislation even though his approval of it is as integral a part of the law-making process as is approval by the House and Senate.
[22] In our pursuit of a rational reading of the language of the constitution today, Section 129's placement of one of the Lieutenant Governor's feet in the Senate may be seen as a check on legislative power. We consider this notion in the context of Alexander's teaching that

there is another side to the coin labeled on one side "separation of powers." This other side, commonly referred to as "checks and balances," is the mandate that important checks be placed upon each department's [officers] exercise of ... [the] powers [committed to that department].
Alexander, 441 So.2d at 1346.
The authority granted the Lieutenant Governor in the Senate may be seen as an executive check upon legislative power not altogether unlike the veto power enjoyed by the governor. Indeed, there is evidence that proponents of the office of Lieutenant Governor in the 1890 convention considered it desirable that committees in the Senate be appointed and answerable to the people as a whole. This was seen as an advantage in that an ordinary senator exercising those powers (which, to be sure, someone would have to exercise) would inevitably be subject to the "local influences" of his or her personal constituents. See page 341, supra; Daily Clarion-Ledger, October 22, 1890, at 1, col. 2.
The point for the moment, of course, is that, if the Senate wishes to exercise its authority under Section 55 to give the lieutenant governor a check power greater than that given him by the constitution, that is the Senate's business.
[1] See Miss. Const. 1817, 1832 and 1869.
[2] As reprinted in XIII Writings of George Washington 277, 306 (Ford ed., New York, 1892).
[3] In a letter to Richard Henry Lee dated 15 Nov. 1775, and reprinted in IV Works of John Adams, 185, 186 (Chas. F. Adams ed., Boston, 1851).
[4] The Federalist No. 47, originally published in the New York Packet Feb. 1, 1778, as reprinted by the Nat. Home Lib. Foundation with an introduction by Earle in The Federalist 312, 313 (Sesquicentennial ed., Washington, D.C. 1938).
[5] Article V, Section 128. There shall be a lieutenant governor, who shall be elected at the same time, in the same manner, and for the same term, and who shall possess the same qualifications as required of the governor.
[6] Article V, Section 132. In case the election for lieutenant governor shall be contested, the contest shall be tried and determined in the same manner as the contest for the office of governor.
[1] The majority opinion quite fairly sets forth at length the vast powers bestowed upon the lieutenant-governor by the Senate, and I won't repeat them. It remains difficult, however, to make clear the difference in compass and magnitude between the limited and circumscribed authority given the lieutenant-governor by Section 129 and those given his office by the Senate rules. Comparing a thimbleful to a tub of water is not an unfair methaphor.
[2] Section 128 states:

There shall be a lieutenant-governor, who shall be elected at the same time, in the same manner; and for the same term, and who shall possess the same qualifications as required of the governor.
Section 130 states:
The lieutenant-governor shall receive for his services the same compensation as the speaker of the house of representatives.
Section 131 provides for the conditions under which the lieutenant governor fulfills the duties of governor.
Section 132 states:
In case the election for lieutenant-governor shall be contested, the contest shall be tried and determined in the same manner as a contest for the office of governor.
Sections 128 through 132 embrace the entirety of our Constitution's provisions of the office of lieutenant-governor.
[3] He is the lieutenant-governor.
[4] One is tempted to say, "Oh, pshaw!" to statements that simply because the Constitution authorized the lieutenant-governor to sit in a limited capacity in the Senate, it also authorizes the Senate to give him all these powers. The Constitution makes it clear the drafters meant precisely opposite what the majority argues. Just two sections set out the entire authority of the lieutenant-governor, Sections 129 and 131. Section 131 states that if the office of governor becomes vacant by death or otherwise, the lieutenant-governor "shall possess the powers and discharge the duties of said office." If the governor is absent from the State, or disabled by protracted illness, the lieutenant-governor "shall discharge the duties of said office." In either of these events he is given all the authority of the governor without limitation.

Yet as president of the senate, he is limited to just two functions which might be classed as legislative, to express his views in floor debate and vote in case of a tie. If this circumscribed authority was meant to authorize him to assume the powers the senate has bestowed, it is indeed strange the drafters did not state as much. Can anybody possibly believe that if the drafters had intended that the lieutenant-governor should be permitted to assume such awesome legislative powers totally beyond and outside the scope of those specifically granted by Section 129, they would have spelled them out?
The same drafters wrote Sections 1 and 2 and knew that Section 129 was making certain specific exceptions to them. If they had intended more exceptions, especially of such monumental proportion, can anyone doubt they would have specifically stated them?
A far more plausible reason for the lieutenant-governor being permitted to sit as presiding officer of the Senate with two limited and circumscribed powers is that under Section 131 the lieutenant-governor is simply a spare tire. To give his office some utility, the Constitution's drafters authorized him to preside over the Senate with these two additional limited powers.
Had his office been restricted to this authority, the lieutenant-governor would have remained in fact, as in law, an executive officer.
As it is, his office has been debased in fact from an executive to a legislative office.
[5] The majority virtually ignores the strongest, and in my view, the only point with any credibility, which is the long history, antedating even the 1890 Constitution, of the lieutenant-governor exercising powers beyond those specifically authorized by the Constitution. Therefore, I do not address this. For examples of courts of other states grappling with similar constitutional provisions regarding the lieutenant-governor, see: 70 A.L.R 1077; State ex rel. Easbey v. Highway Patrol, 410 Mont. 383, 372 P.2d 930 (1962).
[6] It has been argued that by permitting the Senate to give the lieutenant-governor these additional powers, we are letting the people of the entire state have a voice in appointing senate committees, setting rules, etc., rather than one senator elected from a single district. If this is the case, why has the senate not passed a proposed Constitutional amendment to give him such authority, or at the very least a statute, so that the people would know it could not be stripped away on thirty seconds' notice?
[7] If the reader has any reservation at this point that the office of lieutenant-governor has indeed been stultified as an executive office by these Senate rules, such doubt may be removed once and forever by answering two questions:

Whenever the President of the United States and the Congress get into a squabble, how often have you read of the Vice-President publicly siding with the Congress?
Whenever the Governor and the Legislature get into a squabble, how often have you read of the Lieutenant-Governor publicly siding with the Governor?