# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01269-COA

**ESTATE OF HERBERT G. ROGERS, III**          **APPELLANT**

**v.**

**THE ESTATE OF FREDERICK ROBBINS**          **APPELLEES**
**ROGERS, MARY NELL ROGERS BRANDT,**
**NORTH MISSISSIPPI FISH & GAME**
**PRESERVE CLUB, INC., AND ROBBINS ELLIS**
**ROGERS**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/22/2021 |
| TRIAL JUDGE: | HON. STEPHEN TRAVIS BAILEY |
| COURT FROM WHICH APPEALED: | UNION COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | CHANDLER ROGERS |
| | J. MARK SHELTON |
| ATTORNEYS FOR APPELLEES: | WILLIAM HULL DAVIS JR. |
| | H. RICHMOND CULP III |
| | ROBERT E. QUIMBY |
| | MARY NELL ROGERS BRANDT (PRO SE) |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 06/20/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND SMITH, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. For nearly sixty years, the Rogers family enjoyed visiting a cabin at Darden Lake in Union County. Around 1960, Herbert Rogers Jr. became a member of the North Mississippi Fish and Game Preserve Club ("Darden"),[1] which owned Darden Lake and the surrounding

---

[1] Darden began as an unincorporated association and was later organized as a nonprofit corporation. *See infra* ¶¶5, 10. In this opinion, we refer to both the nonprofit corporation and the predecessor unincorporated association as "Darden."

land, and built a cabin on the lakeside lot assigned to him. Herbert Jr., his wife, and his three children used the cabin, and later his children's families also used the cabin as his guests. In 1984, Herbert Jr. took steps to ensure his children could continue to use the cabin after his death. Herbert Jr. transferred his Darden membership and cabin to his son Frederick Robbins Rogers (Fred). In consideration for the transfer, Fred signed an agreement requiring him "to hold [the] membership in trust for the use and benefit of" him and his two siblings—Herbert G. Rogers III (Herbert III) and Mary Nell Rogers Brandt (Mary Nell)—"during [Fred's] lifetime . . . or until the membership [was] disposed of by mutual agreement of" all three siblings. The 1984 Agreement also provided that if Fred predeceased Herbert III and Mary Nell, the membership would be transferred to either Herbert III or Mary Nell "to be held in trust by them under the same terms and conditions of [the] Agreement." For about thirty-five years thereafter, the siblings and their children shared the cabin without any significant disagreement.

¶2.     That all changed in 2019 when Fred transferred the membership to his son Robbins Ellis Rogers (Robbins). The Estate of Herbert III, who had passed away, immediately filed suit in chancery court, alleging that the transfer to Robbins should be set aside because it violated the 1984 Agreement. Mary Nell joined in the Estate's request to set aside the transfer, and she authorized the Estate to enforce her rights under the 1984 Agreement. In response, the defendants—Robbins, Fred, and Darden—argued that the 1984 Agreement was invalid or void ab initio. After a bench trial, the chancellor held that the 1984 Agreement

2

was void ab initio and that the transfer of the Darden membership to Robbins was valid. Herbert III's Estate appealed.

¶3.    For the reasons discussed below, we hold that the 1984 Agreement is valid and enforceable and that Fred breached the Agreement by transferring the Darden membership to Robbins.   We also conclude—subject to Darden's rules and restrictions regarding membership transfers—that Mary Nell may elect to specifically enforce the Agreement. Therefore, we reverse the judgment of the chancery court and remand the case for further proceedings consistent with this opinion.  We affirm the chancery court's judgment to the extent that it dismissed Herbert III's Estate's claims for damages and other relief.

## FACTS AND PROCEDURAL HISTORY

### *Darden*

¶4.    The North Mississippi Fish and Game Preserve Club Inc., commonly known as "Darden," is presently organized as a nonprofit corporation.  Darden owns property consisting of approximately 1,300 acres in Union County, including Darden Lake.  Subject to Darden's rules and regulations, its members may use the property for hunting, fishing, and recreational purposes, and each member has the exclusive right to use and occupy a designated lot and cabin on the property.  Darden is popular but exclusive—it is limited to a maximum of fifty members.

¶5.    Darden's predecessor was formed in 1929 as an unincorporated association, and its members were issued stock certificates.  The reverse side of the stock certificates set forth

3

certain rules and conditions of membership. The earliest stock certificate in the record is a certificate issued to Fred in 1984. The certificate stated that it conferred upon the member the "right and privilege to [Darden's] properties . . . for hunting, fishing and recreation, as provided by [Darden's] Constitution and By-Laws . . . and such rules and regulations as may be deemed expedient and necessary and duly adopted by [Darden's] Executive Committee." The "title to" the Darden's property was held by a trustee for the benefit of all stockholders, and the stock certificate made clear that "[n]o stockholder" possessed title to or "any individual and separate interests in the lands of said stockholders."

¶6.     Each member was allowed to build a cabin on his designated lot, subject to the "approval," "reasonable regulations," and "control" of Darden's Executive Committee. Each cabin was "considered [to] be the individual and personal property of the member." The member could remove or sell his cabin; however, if a cabin was sold to a non-member, it had to "be immediately removed."

¶7.     The stock certificate stated that except for hunting and fishing guests, a member was allowed to have "any number of guests at any time, . . . subject to the regulations and rules governing the same adopted by the Executive Committee." Each member was allowed a limited number of hunting and fishing guests, as "determined by the Executive Committee." With the exception of a member's wife and unmarried dependent minors, all of a member's relatives were considered "guests" for purposes of Darden's rules. The certificate stated that no guest was permitted on the property unless accompanied by a member; however, this

4

particular provision was not strictly enforced.

¶8.    The certificate provided that no stockholder could "sell out or dispose of his interest in [Darden] or subsequent corporation[] to any third party without first giving to his . . . co-stockholders the right to purchase his interest therein upon the basis of actual investment plus six [percent] interest thereon per annum during his period of investment."  In addition, the certificate provided that a stockholder could sell his stock and membership in Darden only to a person who had "been duly approved and recommended by the Executive Committee, and elected by the stockholders."  The certificate also provided that a stockholder could "bequeath" his stock and membership in Darden, "or his estate [could] sell the same," to a person who had been approved and recommended by the Executive Committee and elected by the stockholders.

¶9.    Finally, each stockholder expressly agreed to "be bound by all of the provisions of [Darden's] Constitution and By-Laws . . . , and all rules and regulations of the Executive Committee . . . [t]heretofore made or which [might] [t]hereafter be made in accordance with the provisions of said constitution[.]"  The certificate stated that Darden's constitution and bylaws were "incorporated as part of [the] certificate."  However, the record in this case does not include the constitution or bylaws of the unincorporated association.  With respect to the unincorporated entity, the record includes only those rules and conditions found on the reverse side of the 1984 certificate issued to Fred.

¶10.    In 1993, Darden was reorganized as a nonprofit corporation.  Each member exchanged

5

his or her stock certificate from the old unincorporated entity for a stock certificate from the new nonprofit corporation. The new nonprofit also adopted new bylaws. Under the new bylaws, each member is entitled to the exclusive use and occupancy of the member's designated lot and cabin.

¶11. The new bylaws provide that any transfer of a membership must comply with all requirements of the bylaws—and that any transfer that does not comply with the bylaws "shall be void." The bylaws require a member to give written notice of a proposed transfer to Darden, which will then mail notice to all members. If ten or more members object to the proposed transfer, it cannot be completed. Otherwise, the transfer will be approved, and a new stock certificate will be issued to the transferee. The bylaws provide that a "deceased member's membership interest in the corporation shall remain as part of the deceased member's estate until such time as such estate has received approval of the transfer of such membership interest." The deceased member's estate must follow the same procedure to obtain approval for a transfer. Finally, the new bylaws provide that "[n]o member may in any manner encumber or pledge any part of his membership interest" and that Darden "shall not honor any pledge or encumbrance or pledge of a membership interest."

### *The Rogers Family*

¶12. Herbert Jr. became a member of Darden around 1960 and built a cabin on the lot assigned to him. One document in the record indicates that Herbert Jr. owned the "membership and cabin in trust for the benefit of Rogers LP Gas Company," a company

owned by Herbert Jr. It is not clear how this "trust" was created or documented. Nor does it appear that the trust had any practical significance. But it does appear that Rogers LP Gas Company paid the expenses related to the cabin and membership until around 1986.

¶13. Herbert Jr. and his first wife had three children: Herbert III, Fred, and Mary Nell. Herbert Jr. and his family enjoyed using the cabin at Darden, and later his children's families used the cabin as his guests. Herbert Jr. and his wife divorced at some point, and in 1971 Herbert Jr. married Jimmie T. Rogers.

¶14. In 1984, Herbert Jr. transferred his Darden membership and cabin to Fred. "[F]or and in consideration of" the Darden membership, Fred signed a separate agreement under which he promised "to hold [the] membership in trust for" himself and his two siblings, Herbert III and Mary Nell. The 1984 Agreement required Fred to hold the membership in trust for him and his siblings "during [his] lifetime . . . or until the membership [was] disposed of by mutual agreement of" all three siblings. The 1984 Agreement also provided that if Fred predeceased Herbert III and Mary Nell, then the Darden membership would be transferred to either Herbert III or Mary Nell "to be held in trust by them under the same terms and conditions of [the] Agreement." The Agreement provided that Fred's then-wife, Margaret Rogers, would make the transfer in the event of Fred's death. The Agreement also provided that it would "bind the parties and their heirs, legal representatives, and assigns." The Agreement has signature lines for Herbert Jr., Fred, Herbert III, Mary Nell, and Margaret. However, it appears that only Fred signed the Agreement.

7

¶15. After the transfer to Fred, Rogers LP Gas Company continued to pay the expenses associated with the membership and cabin until 1986. In 1986, another company owned by Herbert Jr., Rogers Investments Inc., began paying those expenses. In 1989, Herbert Jr. died, and Fred, Herbert III, and Mary Nell each inherited a one-third interest in Rogers Investments, which continued to pay the expenses of the membership and cabin. In 1993, when Darden was reorganized as a nonprofit corporation, Fred received a new stock certificate from the new entity.

¶16. In 2011, Herbert III filed for bankruptcy. Around the same time, Herbert III had pledged his shares in Rogers Investments as collateral for a loan. When Herbert III defaulted on the loan, Rogers Investments repaid the loan in exchange for a release of Herbert III's shares, thereby buying out Herbert III's interest in the company. Thereafter, Fred and Mary Nell each owned a one-half interest in Rogers Investments. Herbert III passed away in 2015. Herbert III's wife, Mary Swift Rogers (Swift), is the administrator of his estate.

¶17. From 1984 until 2018, the Rogers family continued to share the Darden cabin without any significant disagreements. At some point, Fred created an alternating-weeks schedule, with his family and Herbert III's family each having access to the cabin every other week. Later, Fred's sons (Robbins and Bradley) and Herbert III's sons (Chandler and Graham) and their families also shared the cabin. Mary Nell and her family lived in South Carolina and rarely visited the cabin.

¶18. Beginning in the 1990s or early 2000s, Mary Nell and her brothers discussed the

8

possibility of Fred and Herbert III buying out Mary Nell's interest in the cabin. Mary Nell testified that "Fred and Herbert [III] both had said . . . we each will buy a half of your third." According to Mary Nell, her brothers always understood that each of them would buy half of her interest in the Darden membership so that her four nephews could all share "equally" in the membership. In 2017, Mary Nell finally obtained an appraisal of the cabin, but she testified that she did not think she ever discussed the appraisal with Fred.

¶19.   In mid-2018, Fred asked Darden's officers about the procedure for transferring his membership. Then in December 2018, Fred notified Darden that he intended to transfer his membership to Robbins. Darden mailed notice of the proposed transfer to all members and received only one objection in response. Therefore, on January 22, 2019, the transfer was completed, and a new membership certificate was issued to Robbins.

¶20.   Robbins did not pay any money or give any other consideration for the membership or cabin. Robbins testified that he became aware of Fred's 1984 Agreement with Herbert Jr. before the membership was transferred to him in January 2019. Nonetheless, Robbins now considers himself the sole and exclusive owner of the membership and cabin.

### Procedural History

¶21.   The same day that the transfer was completed, Herbert III's Estate filed suit against Fred, Mary Nell, and Darden in the Union County Chancery Court.[2] The next day, the Estate amended its complaint to add Robbins as a defendant. With leave of court, the Estate later

---

[2] Herbert III's son Chandler has represented the Estate both at trial and on appeal.

filed a second amended complaint and a third amended complaint. The Estate alleged that Fred's transfer to Robbins violated the 1984 Agreement. The Estate also alleged that Fred was "unable to manage his own affairs" and lacked "mental capacity" to transfer his membership to Robbins. The Estate asked the court to:

- set aside the transfer from Fred to Robbins and specifically enforce the 1984 Agreement;

- or, in the alternative, impose a "constructive trust" or "resulting trust" on the Darden membership and cabin;

- or, in the alternative, award damages for "unjust enrichment" based Herbert III's alleged payment of expenses related to the membership and cabin.

¶22. Mary Nell filed a pro se answer and "joinder." Mary Nell stated that she joined in the Estate's request to set aside the transfer of the Darden membership to Robbins. Mary Nell alleged that her father intended for each of his three children to have equal "rights" in "the Darden property." Therefore, Mary Nell stated that she joined the Estate's complaint to the extent that it sought an order that would "preserve[] the ownership interests of the Darden property to the heirs of [Herbert III], to [Fred], and to [her]self, and further preserve[] such ownership interests upon [her] death to [her] heirs and to the heirs of [Fred] upon his death." Mary Nell also stated that she would "assign" the Estate her "rights and interest with respect to pursuing enforcement of the [1984] Agreement," but she "maintain[ed] her interest in the Darden property itself." That is, she "authorize[d] and empower[ed]" the Estate to take "necessary and proper" actions "on [her] behalf" in order to protect the "one-third ownership

10

interests in the Darden property" allegedly belonging to herself and to the heirs of Herbert III, respectively. Finally, Mary Nell stated that she did *not* assign her rights to the Estate to the extent it sought relief that would "deprive [her], or likewise [her] heirs upon [her] death, of [her] one-third interest in the Darden property or . . . deprive [Fred] of his one-third interest in the Darden property, or likewise to his heirs upon his death."

¶23. In their answers and in subsequent motions to dismiss and for summary judgment, Robbins, Fred, and Darden argued that the 1984 Agreement was invalid or void ab initio, that Herbert III's Estate lacked standing, and that Fred was mentally competent to transfer his membership to Robbins. In addition, they argued that Herbert III's Estate's claims were barred by the doctrine of judicial estoppel because Herbert III did not disclose his alleged interest in the Darden membership and cabin in his prior bankruptcy filings.

¶24. Fred passed away in 2020, and his estate was substituted as a party. Fred's two sons, Robbins and Bradley, are the co-executors of Fred's estate. Fred was deposed prior to his death, and his deposition was admitted into evidence at trial.

¶25. In April 2021, the chancellor denied the defendants' motions for summary judgment, and the case proceeded to a bench trial. Robbins, Mary Nell, Jimmie, and Swift testified, and Fred's deposition was admitted into evidence. Other witnesses included Fred's longtime friend and former Darden president Alan Jackson; the president and secretary/treasurer of Darden at the time Fred transferred his membership to Robbins; and a certified public accountant (CPA) who testified regarding Herbert III's Estate's alleged damages.

11

¶26. In October 2021, the chancellor entered an opinion and final judgment dismissing all Herbert III's Estate's claims with prejudice. The chancellor held that although "the 1984 Agreement . . . was *on its face* a valid and enforceable contract," it was "void ab initio in that it sought to circumvent the valid, enforceable contract of the existing members of the unincorporated association in 1984." The chancellor also found that the 1984 Agreement was contrary to Darden's current bylaws. Therefore, the chancellor held that neither Herbert III's Estate nor Mary Nell had "any legally enforceable rights" to the membership or cabin. The chancellor also held that the Estate's claims were barred by the doctrine of judicial estoppel; that the Estate failed to establish that Fred lacked mental capacity at the time he transferred his members to Robbins; that the Estate lacked standing; that the Estate failed to prove that it was entitled to any damages for unjust enrichment; and that the Estate failed to show that it was entitled to a constructive or resulting trust. Herbert III's Estate appealed.

**ANALYSIS**

¶27. If supported by substantial evidence, a chancellor's findings of fact will not be reversed unless the chancellor abused his discretion, manifestly or clearly erred, or applied an erroneous legal standard. *Wayne Cnty. Sch. Dist. v. Quitman Sch. Dist.*, 346 So. 3d 853, 857 (¶15) (Miss. 2022). However, we review issues of law de novo. *Id.*

¶28. On appeal, Herbert III's Estate raises numerous issues that we summarize and address below as follows: (1) whether the chancellor erred by holding that the 1984 Agreement was void ab initio; (2) whether the Estate has standing and whether it proved its claim for unjust

12

enrichment and damages; (3) whether the Estate is entitled to a "constructive trust" or a "resulting trust"; (4) whether the doctrine of judicial estoppel bars the Estate's claims; and (5) whether the chancellor manifestly erred by finding that the Estate did not prove that Fred lacked mental capacity at the time he transferred his membership to Robbins. Herbert III's Estate asks this Court to reverse and "instruct[] [the chancellor] . . . to enter an order compelling . . . Robbins[] to comply with a schedule of shared time [to be] devised by the [c]hancellor providing for equal time on a one-third, one-third, one-third basis."

¶29.    We cannot grant the relief that Herbert III's Estate requests because there is no legal basis for granting joint custody of the Darden cabin to the Estate or any other party. We do, however, conclude that the chancellor erred by holding that the 1984 Agreement was void. We hold that—subject to Darden's rules and restrictions on membership transfers—Mary Nell may elect to specifically enforce the 1984 Agreement. Therefore, we reverse and remand the case for further proceedings consistent with this opinion.

**I.        The 1984 Agreement is valid and may be specifically enforced.**

¶30.    The 1984 Agreement at issue in this appeal is a simple, one-page contract. It states that "in consideration of" the Darden membership Fred received from Herbert Jr., Fred "agree[d] to hold said membership in trust for the use and benefit of [Fred, Herbert III, and Mary Nell] during [Fred's] lifetime or until the membership [was] disposed of by mutual agreement of [the three siblings]." The Agreement also provided that if Fred predeceased

13

Herbert III and Mary Nell, Fred's wife Margaret[3] "agree[d] to transfer said membership to either [Herbert III] or Mary Nell . . . to be held in trust by them under the same terms and conditions of [the] Agreement."

¶31.	To begin with, we agree with the chancellor's conclusion that "the 1984 Agreement . . . [is] *on its face* a valid and enforceable contract." Under Mississippi law, "[t]he elements of a valid contract are: (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, [and] (6) no legal prohibition precluding contract formation." *Woodruff v. Thames*, 143 So. 3d 546, 554 (¶19) (Miss. 2014) (quoting *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003)). Here, Fred clearly received consideration (the Darden membership and cabin), the contract is definite, there is no issue regarding any party's capacity at the time the contract was made, and Fred signed the contract, thereby manifesting his assent to be bound by its terms.[4]

¶32.	In addition, due to Fred's death, we are no longer concerned with Fred's obligation under the Agreement to hold the membership and cabin "in trust" during his lifetime for his siblings' "use and benefit." Rather, given Fred's death, the critical provision is Fred's agreement to transfer the membership and cabin to either Herbert III or Mary Nell upon his

---

[3] Fred and Margaret later divorced.

[4] In the chancery court, the defendants argued that the 1984 Agreement was invalid because Herbert Jr., Fred's siblings, and Margaret did not sign it. The chancellor rejected that argument, finding that the parties' conduct demonstrated their mutual assent to be bound by its terms. The defendants do not challenge this finding on appeal.

death. In substance, this provision is simply a contract by Fred to leave certain property at his death to a surviving sibling. It is well established that such contracts are valid and enforceable under Mississippi law. *McKellar's Est. v. Brown*, 404 So. 2d 550, 552 (Miss. 1981) ("The rule is well established that a person may contract to devise his property by will, and such a contract is not repugnant to public policy." (citation omitted)); *accord Williams v. Mason*, 556 So. 2d 1045, 1048 (Miss. 1990); *Monroe v. Holleman*, 185 So. 2d 443, 448 (Miss. 1966); *Strange v. Tax Comm'n*, 192 Miss. 765, 774, 7 So. 2d 542, 544 (1942). Indeed, "equity [will] require [specific] performance of [such a] contract . . . even if no will [was ever] made." *In re Sadler's Est.*, 232 Miss. 349, 365, 98 So. 2d 863, 869 (1957) (citing *Price v. Craig*, 164 Miss. 42, 55, 143 So. 694, 697 (1932)).

¶33. We acknowledge that Herbert III's Estate argues that the 1984 Agreement imposes more extensive requirements on additional parties. Specifically, Herbert III's Estate argues that the Agreement reaches the next generation of the Rogers family and requires the children of Fred, Herbert III, and Mary Nell[5]—i.e., Herbert Jr.'s grandchildren—to continue to hold the membership and cabin in trust for one another. However, the Agreement does not name any of Herbert Jr.'s grandchildren, nor does it purport to require the membership or cabin to be transferred to anyone after Herbert Jr.'s three children are deceased. In making this argument, Herbert III's Estate relies on a provision of the Agreement that states, "This Agreement shall bind the parties and their heirs, representatives, and assigns." However, this

---

[5] Fred and Herbert III each have two sons. Mary Nell has four children.

15

single sentence does not grant any *rights* or require the transfer of the membership or cabin to anyone beyond the parties named in the Agreement. Rather, the sentence simply requires the parties' heirs, representatives, and assigns to cooperate, to the extent necessary, in making the transfers that are expressly required by the Agreement.

¶34. We now turn to the defendants' arguments that Fred's seemingly valid contract to convey the Darden membership to a sibling upon his death is void because it conflicts with the rules of the unincorporated association or its successor nonprofit corporation. As an initial matter, the defendants correctly argue that Fred agreed to be bound by Darden's membership transfer restrictions and other bylaws. For example, in the membership stock certificate that Fred signed in 1984, Fred expressly agreed to

> be bound by all of the provisions of the Constitution and By-Laws of [Darden], and all of the rules, regulations and requirements of the Executive Committee of said Club [previously] made or which [might] [t]hereafter be duly made in accordance with the provisions of said [C]onstitution, and the same [would] be considered as part of [Fred's] certificate.

Therefore, Fred agreed to be bound by Darden's rules—both those rules then in effect and any others thereafter duly made. In addition, the certificate restricted Fred's ability to convey his interest in the unincorporated entity "or subsequent corporation." Thus, the document expressly contemplated that the unincorporated entity might be incorporated in the future.

¶35. Under Mississippi law, by signing the membership stock certificate, Fred agreed to be bound by Darden's membership-transfer restrictions and other bylaws, which are a valid contract by and between Darden's members. *See, e.g., Clarke Cnty. Co-op. (AAL) v. Read,*

16

243 Miss. 879, 887, 139 So. 2d 639, 642 (1962) (holding that a member of an agricultural cooperative was bound by its by-laws, which constituted a contract by and between the members); *Delta Elec. Power Ass'n v. Campbell*, 303 So. 3d 695, 697 (¶7) (Miss. 2020) (holding that members of a nonprofit electric cooperative agreed to be bound by its by-laws, including subsequent amendments thereto); *see also* Miss. Code Ann. § 79-11-179 (Rev. 2013) (authorizing a nonprofit corporation to impose restrictions on membership transfers). Accordingly, Fred could not simultaneously enter into a separate contract that would violate Darden's membership-transfer restrictions. Thus, we agree with the chancellor in principle that the 1984 Agreement would be invalid to the extent that it "was a surreptitious attempt by Herbert Jr. and his children to circumvent [Darden's] written rules."

¶36. This requires us to determine whether there is, in fact, any irreconcilable conflict between the 1984 Agreement and operative Darden bylaws. Several provisions are relevant to this issue. First, Fred's 1984 membership stock certificate provided:

> This Membership Certificate shall not be negotiable or transferable by the holder . . . except and unless to some person who shall have been duly approved and recommended by the Executive Committee, and elected by the stockholders of said club.

¶37. The membership stock certificate further provided:

> Such privilege granted hereunder shall cease . . . at the death of holder thereof, *provided however that such holder may bequeath said certificate* or his estate may sell the same, to such person as shall be so approved, recommended and elected as above specified.

(Emphasis added).

17

¶38. When it was reorganized as a nonprofit corporation in 1993, Darden enacted new bylaws. Importantly, Article IV of the new bylaws includes a "Membership Restriction Agreement" (MRA) that provides as follows:

> A. _Restrictions_: No membership interest in the corporation or any rights, title or interest therein, whether now owned or hereafter acquired, shall be sold, transferred, assigned or encumbered, except in accordance with the provisions of this agreement. Any disposition of any membership interest contrary to the provisions hereof shall be void and the corporation shall have no obligation to honor such transfer or purported transfer.
>
> B. _Authorized Transfers_: If a member desires to transfer his membership interest in the corporation he shall give written notice to the secretary of the corporation setting forth the name of the prospective transferee. The secretary of the corporation shall, within twenty (20) days after receiving such notice, mail notice to all members notifying them of the proposed transfer and identifying the proposed transferee. Each member of the corporation shall then have twenty (20) days to notify the secretary of his approval or disapproval of such transfer. If ten (10) or more members notify the secretary in writing that they do not approve of the transfer, then the proposed transfer shall not be made. After a proposed transfer has been disapproved, no further proposed transfer to the same transferee shall be considered for a period of one (1) year.
>
> C. _Death_: Upon the death of a member, the deceased member's membership interest in the corporation shall remain as part of the deceased member's estate until such time as such estate has received approval of the transfer of such membership interest. The estate of the deceased member shall obtain such consent in the manner set forth in paragraph B, above.
>
> D. _Encumbrance_: No member may in any manner encumber or pledge any part of his membership interest in the corporation. The corporation shall not honor any encumbrance or pledge of a membership interest.

¶39. Darden argues that the 1984 Agreement is invalid because—contrary to the MRA—it purports to require a transfer of Fred's Darden membership (upon Fred's death) to either

18

Herbert III or Mary Nell "without going through the normal membership process" set out in the MRA. Darden asserts that "the 1984 Agreement clearly had no authority to dictate who the next owner of the membership would be."

¶40. But we think that the 1984 Agreement can and should be interpreted in a manner consistent with Darden's MRA. When construing a contract, "[t]he goal of this Court is to give effect to the intention of the parties." *HeartSouth, PLLC v. Boyd*, 865 So. 2d 1095, 1105 (¶27) (Miss. 2003). Moreover, if a contract

> is susceptible of more than one construction, then in order to ascertain the intention of the parties, it should be construed in the light of the circumstances surrounding the parties at the time, and it becomes the duty of the court to consider the nature of the agreement, together with all the facts and circumstances leading up to and attending its execution, the relation and condition of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract.

*Lewis v. Lewis*, 239 Miss. 728, 738, 125 So. 2d 286, 291 (1960). In addition, "when a contract term can be interpreted in at least two ways, and when one of these interpretations would result in a valid contract and the other would cause the agreement to be void . . ., the former interpretation is preferred." 5 Margaret N. Kniffin, *Corbin on Contracts* § 24:22, at 232 (Joseph M. Perillo ed., rev. ed. 1998); *accord* 11 Richard A. Lord, *Williston on Contracts* § 32:11, at 750-53 (4th ed. 2011) ("[I]nterpretations which render the contract valid or its performance possible are preferred to those which render it invalid or its performance impossible."); *see also Grandberry v. Mortg. Bond & Tr. Co.*, 159 Miss. 460, 467-68, 132 So. 334, 335 (1931) (A contract "shall be construed, if possible, so as to make

19

it legal, rather than . . . illegal." (quoting *Citizens' Bank v. Frazier*, 157 Miss. 298, 302 127 So. 716, 717 (1930))).

¶41. Here, Herbert Jr. clearly intended that the Darden membership should be transferred to Herbert III or Mary Nell upon Fred's death, and Fred agreed to that term. Indeed, Fred's agreement to that term was the consideration for Herbert Jr.'s transfer of the Darden membership to Fred. Moreover, "the circumstances surrounding the parties at the time" of the 1984 Agreement include Herbert Jr.'s and Fred's knowledge of and familiarity with Darden's bylaws and restrictions on stock transfers. *Lewis*, 239 Miss. at 738, 125 So. 2d at 291. We presume that Herbert Jr. and Fred were aware of Darden's restrictions on transfers[6] and did not intend to make a contract that would violate or subvert those restrictions.

¶42. As stated above, if it is possible, we must construe the 1984 Agreement in a manner that renders it valid and capable of performance, rather than void or impossible to perform. Therefore, rather than interpret the Agreement in a way that conflicts with Darden's bylaws, we interpret the Agreement to require Fred's estate to transfer the membership to a surviving sibling (Mary Nell) *subject to and conditioned upon the Darden members' approval of the transfer pursuant to the process set out in Darden's bylaws*. Interpreting the 1984 Agreement in that manner will give effect to the Agreement, the clear intent of the contracting parties, and Darden's bylaws and membership transfer restrictions.

---

[6] "In Mississippi, a person is charged with knowing the contents of any document that he executes." *Russell v. Performance Toyota Inc.*, 826 So. 2d 719, 726 (¶28) (Miss. 2002).

¶43.    We recognize that the defendants also argue that the 1984 Agreement is invalid because it constitutes an "encumbrance" on the Darden membership, which the MRA also prohibits.  However, to the extent that the Agreement is an encumbrance in a technical sense, it does not interfere with the MRA's express purpose.  The MRA states that the purpose of the membership transfer restrictions is simply "[t]o preserve the unique nature of the facility offered by [Darden]."  The MRA pursues this purpose by reserving to Darden's members the right to approve any proposed new member.  As we interpret the 1984 Agreement herein, it will not interfere with the operation or purpose of the MRA because it simply grants Mary Nell a right to the Darden membership—*subject to her approval by Darden's members*. Thus, the 1984 Agreement is not an "encumbrance" on the membership in the sense that it would permit a transfer without the prior approval of Darden's members.

¶44.    In summary, the only provision of the 1984 Agreement left to be enforced is Fred's agreement that the membership should be transferred to a surviving sibling upon his death. In substance, this is nothing more than a contract to make a will, which is valid and specifically enforceable under Mississippi law.  Moreover, this provision of the Agreement is valid because it can be read in a manner that is consistent with Darden's bylaws and membership transfer restrictions.  Fred would not have obtained the Darden membership in the first place had he not agreed to the terms of the 1984 Agreement.  Therefore, it is only equitable that the Agreement should be enforced against Fred's Estate.  Therefore, we reverse the chancery court's judgment and remand the case for further proceedings regarding

21

Mary Nell's rights under the 1984 Agreement.[7]

## II. Herbert III's Estate is not entitled to recover damages for unjust enrichment.

¶45. Herbert III died in 2015, years before Fred transferred the Darden membership to Robbins and then later passed away. Fred fulfilled his promise to hold the membership and cabin "in trust" for Herbert III as long as Herbert III was alive, and any rights that Herbert III had to the membership and cabin terminated when he predeceased Fred. Therefore, Herbert III's Estate has no enforceable rights of its own under the 1984 Agreement.

¶46. As noted above, Herbert III's Estate asserted an alternative claim for "unjust enrichment" based on "significant sums of money" that Herbert III allegedly "paid . . . toward the expenses of the membership and cabin." Herbert III's Estate attempted to prove this claim for damages through the trial testimony of Joseph Brett Babb, a CPA. But the chancellor found that Herbert III's Estate failed to prove that it was entitled to any recovery

___

[7] As discussed above, Mary Nell assigned her rights to enforce the 1984 Agreement to Herbert III's Estate and authorized Herbert III's Estate to act on her behalf. The chancellor concluded that neither Mary Nell nor Herbert III's estate could enforce the 1984 Agreement based on Mary Nell's "concession" on cross-examination that she did not have an ownership interest in the Darden membership. However, on redirect examination, Mary Nell clarified that she still believed that she had an interest in the membership, and the answer and joinder she filed in this case made clear that she sought to enforce her rights under the 1984 Agreement. In context, Mary Nell's "concession" is insignificant. On cross-examination, she properly acknowledged that she did not "own one-third" of the Darden membership because it had never been transferred to her in accordance with Darden's bylaws. What Mary Nell does possess is a right to specific performance of the 1984 Agreement in the manner discussed in this opinion. We reverse the chancery court's judgment and remand the case for that purpose.

22

for unjust enrichment. We agree for at least two reasons.

¶47. First, Herbert III's Estate failed to show that Herbert III had any personal claim for unjust enrichment. Babb conceded that Rogers Investments—not Herbert III—made the "vast majority" of the payments that were the basis of the Estate's claim for damages. Nonetheless, Babb failed to distinguish any payments made by Herbert III personally from payments made by Rogers Investments. Herbert III held only a one-third interest in Rogers Investments until Fred and Mary Nell bought him out. Therefore, even if there could be a claim for unjust enrichment based on payments made by Rogers Investments, that claim would belong to Rogers Investments—not Herbert III's Estate.[8] Moreover, Babb's damages calculation even included the purchase price of a boat that *Chandler* bought, owned, and used at the cabin *after* Herbert III's death. As noted above, Chandler is Herbert III's son and the attorney for Herbert III's Estate. Chandler apparently retrieved the boat after the commencement of this litigation. Clearly, there is no basis for Herbert III's Estate to recover money that Chandler paid after Herbert III's death for a boat that Chandler still owns.

¶48. Second, substantial evidence supports the chancellor's finding that Herbert III's Estate "merely established" that Rogers Investments paid "for various consumable expenses" during

---

[8] *See Bruno v. Se. Servs. Inc.*, 385 So. 2d 620, 622 (Miss. 1980) ("We adopt the rule in Mississippi that an action to redress injuries to a corporation, whether arising in contract or in tort cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative. The rule applies even though the complaining stockholder owns all or substantially all of the stock of the corporation.").

23

the many years that Herbert III and his family used the cabin. As the chancellor found,

Herbert III's Estate "produced no proof that any expenditures were made by Herbert III [that]

increased the value of the property or membership." In addition, Herbert III and his family

"benefitted from the claimed expenditures during their time there." Therefore, the chancellor

properly found that Herbert III's Estate failed to prove unjust enrichment. *See Hughes v.*

*Shipp*, 324 So. 3d 286, 289 (¶3) (Miss. 2021) (stating that "unjust enrichment" requires proof

that the defendants are "in possession of money or property which in good conscience and

justice they should not retain but should deliver to another" (brackets omitted)).[9]

### III.      Herbert III's Estate is not entitled to a constructive trust or resulting trust.

¶49.    Herbert III's Estate also argues that the chancellor erred by not granting the Estate

---

[9] While we agree with the chancellor that Herbert III's Estate failed to prove unjust enrichment, we reject the defendants' argument that the Estate lacked "standing" to pursue this claim. Herbert III's Estate had standing to pursue the claim based on the Estate's allegation that Herbert III had "paid significant sums" that unjustly enriched Robbins and Fred. *See* Miss. Code Ann. § 91-7-233 (Rev. 2021) (An administrator or executor "may commence and prosecute any personal action whatever, at law or in equity, which the testator or intestate might have commenced and prosecuted."). As explained above, the Estate failed to prove this claim at trial, but the claim's lack of merit should not be confused with a lack of standing. *White Cypress Lakes Dev. Corp. v. Hertz*, 541 So. 2d 1031, 1034 (Miss. 1989) (It is a mistake to "confuse standing to sue with the right to relief."); *Dye v. State ex rel. Hale*, 507 So. 2d 332, 338 (Miss. 1987) ("[W]e look only to the allegations of the complaint" to determine the "question of standing" and do not "assume any view of the correctness or ultimate merits of that complaint."); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not confuse weakness on the merits with absence of [jurisdictional] standing." (brackets and quotation marks omitted)); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (Standing "often turns on the nature and source of the claim asserted," but it "in no way depends on the merits" of the claim.).

either a constructive trust or a resulting trust. "A constructive trust is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another." *McNeil v. Hester*, 753 So. 2d 1057, 1064 (¶24) (Miss. 2000). Some "wrongful conduct" by the defendant must be proved to "justify imposition of a constructive trust." *Joel v. Joel*, 43 So. 3d 424, 431 (¶24) (Miss. 2010). A resulting trust arises when "one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference." *In re Est. of Abernathy*, 778 So. 2d 123, 128 (¶18) (Miss. 2001) (quoting *Church of God Pentecostal Inc. v. Freewill Pentecostal Church of God Inc.*, 716 So. 2d 200, 207 (¶22) (Miss. 1998)). "[O]rdinarily," a resulting trust does not involve any "fraud or constructive fraud." *Id.* "A resulting trust is basically an 'intention-enforcing trust'"—i.e., it "is designed to give effect to the actual intention of a party although that intention was not directly expressed." *Id.* Clear and convincing evidence is required to establish both a constructive trust and a resulting trust. *Id.* at (¶20); *Joel*, 43 So. 3d at 430 (¶22).

¶50. In the present case, the chancellor did not err by finding that Herbert III's Estate failed to establish a constructive trust or resulting trust. As explained above, the 1984 Agreement provided that upon Fred's death, the Darden membership should be transferred to a *surviving*

25

sibling. Because Herbert III predeceased Fred, Herbert III's Estate had no right to the membership. Therefore, the membership does not "rightfully belong[] to" Herbert III's Estate, *McNeil*, 753 So. 2d at 1064 (¶24), nor was there any implied "intention" that the membership should be transferred to Herbert III's Estate, *In re Est. of Abernathy*, 778 So. 2d at 128 (¶18). Accordingly, there is no basis for imposing a constructive or resulting trust.

### IV.     Herbert III's Estate's remaining arguments are moot.

¶51.    Herbert III's Estate also argues that the chancellor erred by finding (1) that its claims were barred by the doctrine of judicial estoppel and (2) that it failed to show that Fred lacked mental capacity at the time he transferred the Darden membership to Robbins. However, these issues are moot in light of our resolution of the other issues on appeal.

¶52.    The chancellor held that Herbert III's Estate's claims were barred by judicial estoppel because Herbert III failed to disclose an interest in the Darden membership when he filed for bankruptcy in 2011. *See generally Saunders v. Nat'l Collegiate Athletic Ass'n*, 352 So. 3d 618, 624-26 (¶¶24-30) (Miss. 2022) (applying the doctrine of judicial estoppel in the context of a failure to disclose a claim in bankruptcy). Having considered the parties' arguments on appeal, we remain uncertain whether federal bankruptcy law required Herbert III to disclose his rights under the 1984 Agreement and—if disclosure were required—whether Herbert III's non-disclosure was intentional rather than inadvertent. *See id.* In addition, we note that the chancellor did not have the benefit of the Mississippi Supreme Court's significant intervening decisions in *Saunders* and *Jones v. Alcorn State University*, 337 So. 3d 1062

26

(Miss. 2022), at the time he issued his ruling. *See Saunders*, 352 So. 3d at 626 (¶¶31-32) (reversing the trial judge's application of the doctrine of judicial estoppel and remanding for further consideration in light of *Jones*). Regardless, this issue is now moot because for the reasons explained above, Herbert III's Estate does not have any legal or equitable rights under the 1984 Agreement, and the Estate's claim for damages fails on the merits.

¶53. Herbert III's Estate also challenges the chancellor's finding that it failed to prove that Fred lacked mental capacity at the time he transferred the Darden membership to Robbins. Herbert III's Estate argues that it presented overwhelming evidence that Fred had declined mentally to the point that he was not competent at the time of the transfer. However, for the reasons explained above, we hold that Mary Nell has a right to specifically enforce the 1984 Agreement, subject to Darden's bylaws and membership transfer restrictions. Mary Nell possesses that right regardless of Fred's mental capacity at the time of the transfer to Robbins. Moreover, regardless of Fred's mental capacity at the time of the transfer, Herbert III's Estate possesses *no* rights under the 1984 Agreement. Accordingly, this issue is also moot.

## CONCLUSION

¶54. For the reasons explained above, we conclude that the 1984 Agreement is valid and may be specifically enforced by Mary Nell. Therefore, the chancery court erred by holding that the Agreement was "void ab initio." In addition, Fred breached the 1984 Agreement by transferring his membership to Robbins, Robbins was aware of the 1984 Agreement prior to

27

the transfer, and Robbins gave no consideration for the membership. Therefore, the judgment of the chancery court must be reversed.

¶55. As discussed above, in the chancery court, Mary Nell joined in Herbert III's Estate's requests to set aside the transfer from Fred to Robbins and to specifically enforce the 1984 Agreement. But Mary Nell joined in those requests only to preserve her alleged one-third interest in the Darden membership. She also wanted to preserve one-third interests allegedly belonging to Herbert III's heirs and Fred's heirs. We agree with the chancellor that these alleged one-third interests are inconsistent with Darden's bylaws and simply do not exist under the 1984 Agreement. The right that Mary Nell possesses and may specifically enforce is simply a right to require Fred's estate to transfer the Darden membership to her. Moreover, as explained above, that right is subject to and conditioned upon the approval of Darden's members pursuant to the process set out in Darden's bylaws.

¶56. Therefore, on remand, Mary Nell must first make an election on whether to specifically enforce the right that she *actually* possesses under the 1984 Agreement. If Mary Nell elects to exercise that right, then the transfer of the Darden membership from Fred to Robbins must be set aside. The membership shall revert to Fred's estate, and—pursuant to Darden's own bylaws—Fred's "membership interest . . . shall remain as part of [Fred's] estate until such time as [Fred's] estate has received approval of the transfer of [the] membership interest" in the manner prescribed by Darden's bylaws. As required by the 1984 Agreement, Fred's estate shall notify Darden's secretary that it intends to transfer Fred's

28

membership to Mary Nell. If Darden's members approve the transfer in accordance with Darden's bylaws, the membership shall be transferred to Mary Nell. If Darden's members do not approve the transfer, Fred's estate may dispose of the membership in a manner consistent with Darden's bylaws, Fred's will, and applicable law.

¶57. The judgment of the chancery court is affirmed to the extent that it dismissed with prejudice the claims for damages and other relief asserted by Herbert III's Estate. The judgment is reversed to the extent that the chancery court held that Mary Nell had no legally enforceable rights under the 1984 Agreement, and the case is remanded for further proceedings consistent with this opinion.

¶58. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., NOT PARTICIPATING.**